FLOYD R. GIBSON, Senior Circuit Judge.
 

 This case is before the court on application of the National Labor Relations Board (Board) for enforcement of its order issued on September 28, 1979, citing Armour-Dial, Inc. (company) for unfair labor practices in violation of sections 8(a)(3) and (1) of the National Labor Relations Act.
 
 [1]
 
 The compa
 
 *53
 
 ny manufactures meat products and has a collective bargaining agreement with Local 617 of the Amalgamated Meatcutters and Butcher Workmen, AFL-CIO
 
 [2]
 
 (union). The Board’s order arises out of a suspension of the union’s executive committee. The order requires the company to cease and desist from unfair labor practices, to provide members of the executive committee with back pay, to expunge from its records all written reprimands issued to these employees, and to post an appropriate notice. We conclude that enforcement of that order should be denied.
 

 The facts are not in dispute. Article 21.2 of the contract between the company and the union, in effect at all relevant times, provided that: “[SJhould trouble of any kind arise in the plant, there shall be no strike, stoppage, slowdown, suspension of work or boycott on the part of the Union or its members or the employees * *
 

 The company, for several years, obtained meat products from Iowa Beef Processors (IBP). In March 1977, a sister local of the union was engaged in a strike against one of IBP’s plants. On March 30, union president, Ernest Nelson, and another union official, Norman Reed, met with company officials and stated that they did not want the company to handle IBP products because of the strike at the IBP plant. The company refused the union’s request.
 

 In June, on two separate occasions Nelson told company officials that he was going to tell the employees not to handle Iowa Beef products. The plant manager then distributed a notice to all employees that the company planned to continue purchasing Iowa Beef products; that neither the company nor the union could legally refuse to do business with Iowa Beef; that the union could not legally refuse to work under the circumstances; and that if there was a work refusal, “appropriate disciplinary action” would be taken. Repeated requests from the union to stop handling Iowa Beef products and repeated refusals by the company followed.
 

 On November 4, when an Iowa Beef truck arrived at the company’s loading dock, union president Nelson informed company officials that the employees were “not going to handle [the products] any longer.” Company officials attempted to show Nelson that it was economically necessary for the company to purchase Iowa Beef products. Throughout the morning, Nelson spoke with various union representatives, at both the local and international levels. He persisted in his refusal to have the Iowa Beef products unloaded.
 

 Union vice-president Buechel arrived at the plant shortly after noon and went to work. At about 2:00 p. m., Nelson and Buechel met with company officials, who told Buechel what had happened during the morning and repeated their claims of the economic necessity of handling Iowa Beef products. No agreement was reached. Finally, a company official stated that he was going to take Nelson and Buechel to the dock and order the forklift operators to unload the Iowa Beef truck. The company official continued that if they refused he would order Buechel, a qualified forklift operator, to unload the truck. Buechel said that he would refuse if asked. After additional discussion, Nelson indicated that the truck probably could be unloaded if a meeting between the union and the company officials were scheduled. Such a meeting was scheduled and, shortly thereafter, the Iowa Beef truck was unloaded.
 

 On the following Monday, company officials met with Nelson, Buechel, Norman Reed, chief steward, and Janet Stokke, Kenneth Stokke and Gerald Stromberg, members of the union executive committee. The company officials expressed their belief that the union officials had an obligation to prevent any work stoppage. The union officials, through president Nelson, expressed
 
 *54
 
 their intention to continue refusing to handle Iowa Beef products. The meeting ended.
 

 On Tuesday, November 8, the plant manager held up an Iowa Beef delivery while he circulated another notice to all employees stating the company’s position on refusals to handle Iowa Beef products. Sometime during the morning of November 9, the Iowa Beef truck arrived at the loading dock. At about 10:30 a. m., there was a meeting between several company officials and the entire union executive committee. Nelson reported that the union’s position had not changed. The plant manager read a lengthy statement which reiterated the company’s position that the company had an obligation and an economic need to conduct business with Iowa Beef and that the union could not engage in strikes or slowdowns. The meeting was adjourned.
 

 At the loading dock, the dock foreman instructed a forklift operator to unload the Iowa Beef truck but he refused. The foreman then brought the forklift operator to a conference room where several company officials and the union executive committee, with the exception of Buechel and Ken Stokke, were convened. Employee Morris was asked to unload the Iowa Beef truck. He refused. The union officials were asked to instruct Morris to unload the truck. The union officials complied but Morris persisted in his refusals. Morris was asked why he was refusing. He replied, “I believe the Union has told you why.” Morris was asked what he meant by that, but union president Nelson interjected, “Don’t badger the witness.” Morris was then told that he was suspended.
 

 The company officials proceeded to ask three members of the union executive committee to unload the Iowa Beef truck. They each refused, stating that they were not qualified forklift operators. The meeting ended, to be reconvened at about 12:30 p. m. At this time, the union representatives were told that they were suspended pending further investigation.
 

 A notice was then distributed to the employees, notifying them of a telegram sent to the union demanding their intervention to stop the illegal work stoppages and contract violations, and notifying the employees of the union committee members’ suspension. The notice also made reference to secondary boycott charges which the company had filed against the union.
 
 [3]
 
 Within a few minutes of the time company officials began to distribute the letter, the employees walked out on strike.
 

 Union president Nelson received a ninety-day suspension. Vice-president Buechel received a thirty-day suspension. Union executive committee members Reed, Stromberg, Janet Stokke and Ken Stokke received nine-day suspensions. Forklift operator Morris was also suspended.
 

 A complaint against the company was issued on January 4, 1978. The complaint charged that the action of the forklift operators in refusing to unload the IBP trucks was not instigated by Nelson or the committee and that the company’s action discriminated against the union officials solely on the basis of their position with the union. The administrative law judge (ALJ) found that the company had violated the National Labor Relations Act in its suspensions of Reed, J. Stokke, K. Stokke, and Stromberg, but dismissed the complaint insofar as it alleged that the suspensions of Nelson and Buechel were discriminatorily motivated. The NLRB adopted the ALJ’s decision except for that portion which found that Buechel’s suspension was not in violation of the Act because of Buechel’s direct refusal to unload the IBP truck, if asked to do so. Thus, the Board held that, with the exception of President Nelson’s suspension, the suspensions of the union officials violated the Act. We disagree, and therefore deny enforcement of the Board’s order.
 

 It is axiomatic that an employer may not discipline an employee merely be
 
 *55
 
 cause he or she holds a union office.
 
 Pontiac Motors Division, General Motors Corp.,
 
 132 N.L.R.B. 413, 415 (1961). Union office embodies the essence of protected concerted activities.
 
 See General Motors Corp.,
 
 218 N.L.R.B. 472, 477 (1975),
 
 enforced,
 
 535 F.2d 1246 (3d Cir. 1976). However, there is a crucial distinction between discipline which is imposed because of union affiliation or office and discipline which is imposed for acts, otherwise punishable, which were committed or omitted while exercising union affiliation or office.
 
 See Gould, Inc. v. NLRB,
 
 612 F.2d 728, 733 (3d Cir. 1979). Here, the union executive committee members were suspended not because of their status as union officers but because of their acts and omissions to act while holding union office.
 

 The executive committee members attended meetings wherein the union president made threats of work stoppages if the company did not stop handling IBP products. These threats were illegal under section 8(b)(4) of the N.L.R.A. If employees who were not union officials had come in to threaten a work stoppage under these circumstances, they too could have been, and, we assume, would have been disciplined. To decide other than we do today would shield union officers from disciplinary measures to which they would otherwise be subject. This would be “neither fair, logical nor just.”
 
 Gould, Inc. v. NLRB,
 
 612 F.2d 728, 733 (3d Cir. 1979).
 

 Furthermore, we agree with the Seventh Circuit’s reasoning in
 
 Indiana & Michigan Electric Co. v. NLRB,
 
 599 F.2d 227 (7th Cir. 1979). There the court refused to enforce an order of the Board which held that
 

 disciplining union stewards and a union officer more severely than rank-and-file employees for participation in an unlawful strike was inherently destructive of important employee rights and hence a violation of §§ 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(3) and (1), regardless of business justification and absence of anti-union motivation.
 

 The
 
 Indiana & Michigan Electric
 
 court analyzed relevant Board decisions and stated:
 

 Until recently the Board has recognized that the higher responsibilities of union officials justify disciplining them more severely than rank-and-file members for participating in unprotected activity. A divided Board shifted to the contrary view in
 
 Precision Castings Co.,
 
 233 N.L.R.B. No. 35 (1977), and
 
 Gould Corp.,
 
 237 N.L.R.B. No. 124 (1978).
 

 599 F.2d at 230. (Footnote omitted.)
 

 The court continued: “As the Board said in [its prior] cases, union officials are subject to ‘an even greater duty than the rank- and-file employees to uphold [the contract] provisions.’ ” 599 F.2d at 231. And finally:
 

 Differentiating between union officers and rank-and-file in meting out discipline for participating in a clearly illegal strike did not penalize or deter the exercise of any protected employee right. We believe the employer was entitled to take into account the union officials’ greater responsibility and hence greater fault, and that the resulting different treatment of union officials could not be reasonably considered inherently destructive of important employee rights.
 

 599 F.2d at 232 (footnote omitted).
 

 The only two circuits which have been faced with applying the Board’s principles enunciated in
 
 Precision Castings Co.
 
 and
 
 Gould Corp.,
 
 to the effect that union officials should not be held to a higher standard than rank-and-file union members in avoiding contract violations, have declined to do so.
 
 Indiana & Michigan Electric Co. v. NLRB, supra; Gould, Inc. v. NLRB,
 
 612 F.2d 728 (3d Cir. 1979). The Board distinguishes those two cases from the case at bar in the following manner:
 

 In those cases, the Board held that union officials who merely participate in work stoppages with other employees may not lawfully be disciplined if the criterion for the discipline is their union status and not their misconduct as employees. Here, none of the four officials participated in or induced the work stoppages.
 

 Board’s Decision and Order, dated September 28, 1979,
 
 cited in
 
 the Board’s Brief, p.
 
 *56
 
 17, n.4. We cannot agree with the Board’s conclusion that the union executive committee members did not participate in or induce the work stoppage in this case. Their presence at the meetings between the union and the company, coupled with their acquiescence in the union’s position as espoused in those meetings by President Nelson, does constitute participation in and inducement of the work stoppage which followed. The executive committee lent active support to Nelson’s threats, and it would be naive to think that they were not furthering the union’s intent to foster an illegal boycott under the direction of the union president, Nelson. The role the committee played in inducing the work stoppage will not be overlooked even though the committee members chose to communicate their support in a non-verbal manner. The message conveyed to the company, in the actions taken and not taken by the committee members, was as clear as President Nelson’s position, which was articulated in their presence.
 

 The executive committee members acted in concert with their spokesperson, Nelson. Together they fomented the illegal work stoppage and together they should bear the consequences.
 

 Enforcement denied.
 

 [1]
 

 . The pertinent parts of those sections of the Act provide:
 

 § 8. Unfair labor practices
 

 (a) It shall be an unfair labor practice for an employer—
 

 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7;
 

 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
 

 
 *49
 
 Under 28 U.S.C. § 1915(d), a complaint filed
 
 in forma pauperis
 
 may be dismissed prior to service of process only if the action is “frivolous or malicious.”
 
 Harkins v. Eldredge,
 
 505 F.2d 802, 804 (8th Cir. 1974). See Remmers v.
 
 Brewer,
 
 475 F.2d 52, 53 n.1 (8th Cir. 1973).
 
 *53
 
 (Section 7 provides: “Employees shall have the right to self-organization, to form, join, or assist labor organizations * * * and to engage in other concerted activities for * * * other mutual aid or protection * * *.”)
 

 
 *49
 
 Failure of a complaint to state a claim for which relief can be granted renders that complaint frivolous within the meaning of § 1915(d).
 
 United States ex rel. Walker v. Fayette County, Pa.,
 
 599 F.2d 573, 575 (3d Cir. 1979).
 

 [2]
 

 . The name of the union was changed to United Food and Commercial Workers International Union, AFL-CIO, on June 7, 1979.
 

 [3]
 

 . The union later entered into a settlement agreement with respect to the charges by posting a declaration of its intention not to force, encourage, or condone Iowa Beef Product slowdowns or work stoppages in the future.