**C. H. HEIST CORPORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–2150.**

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1981.

Decided Aug. 24, 1981.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 30, 1981.

William H. Bruckner, Houston, Tex., for petitioner.

John Elligers, N.L.R.B., Washington, D.C., for respondent.

Before SPRECHER and CUDAHY, Circuit Judges, and EAST,* District Judge.

EAST, District Judge.

The Heist Corporation (Company) dismissed an employee, Michael Mitchell (Mitchell), who had been a union steward prior to and during a wildcat strike by certain employees of the Company. The Administrative Law Judge (ALJ), following a union charge of unfair labor practice against the Company, found that the Company's dismissal of Mitchell violated § 8(a)(3) and (1)[1] of the National Labor Relations Act, and ordered Mitchell's reinstatement with back pay. The Board, by a two-to-one majority, adopted without comment the findings and decision of the ALJ. 250 NLRB No. 185.

The Company seeks review of the Board's decision, and the Board cross-appeals for enforcement. We note jurisdiction under 29 U.S.C. § 160(f) and grant enforcement.

*FACTS:*

A rather extensive delineation of the pertinent facts is necessary in order to reach a proper disposition of the parties' contentions.

Mitchell went to work for the Company, which owns several plants, in 1976 and became a union steward in 1978. He filed numerous employee grievances during his tenure as a steward, but was no more active than previous stewards. Although Mitchell had locked horns with the Company's area representative, William Sheehan, on occasion, the ALJ found no lingering hostility from those incidents at the time of the strike.

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. 29 U.S.C. § 158(a)(3) and (1).

In February of 1979, Sheehan posted on the bulletin board new seniority lists reclassifying and essentially demoting six plant employees in accordance with the Company's interpretation of the recently concluded collective bargaining agreement. Late that night an employee telephoned Mitchell at his home and informed him that several employees wanted to obtain from Mitchell a list of employee telephone numbers so that they could ascertain the feelings of the plant employees concerning the demotions. In response to a question, Mitchell indicated that he did not know the union's position on the matter because he had not yet conferred with the union's business agent, and urged the employees to do nothing until the union had been consulted. The employees insisted upon receiving the phone numbers, and Mitchell agreed to supply them. Shortly thereafter, the employees arrived at Mitchell's home and informed him they wanted to organize a "show of strength." Mitchell advised them, instead, to utilize the contractual grievance procedures. They persisted and Mitchell permitted them to phone the other plant employees from his home because, he told them, he "wanted to be in on it" and wanted "to know what was going on."

The next morning some 20 employees gathered at the plant to confront Sheehan. Sheehan called Mitchell into his office and told him that he would not meet with the employees unless they designated their assemblage as a "union meeting." Mitchell delivered that message to the workers, who agreed to the condition. Sheehan then appeared and Mitchell and several other employees presented their grievance. Sheehan responded that the demotion decision had been made at a higher level in the Company, and that it could not be changed at the plant level.

The next day several employees organized a meeting of the Company's workers for the purpose of conducting a strike vote. Mitchell attended the meeting, and when he was asked to state his views on the strike vote, urged the employees not to strike but to instead allow the union to handle the matter through the contractual grievance procedure. He also said that, at the least, the employees should obtain legal counsel before taking action on their own.

The employees voted to strike and, unaccompanied by Mitchell, went to the plant and set up a picket line. Later that night Mitchell went to the plant upon the request of a striking employee who told him that several employees and the police were already there. At the plant, Mitchell explained to an inquiring Sheehan that the employees had voted to strike.

The police, after turning down a Company foreman's request that they arrest Mitchell requested Mitchell to move the employees off the Company property. Mitchell complied.

The workers picketed the plant for two and a half days until the Company obtained an injunction ordering them back to work. Mitchell was present on the picket line "on and off" for about eight hours a day. During the strike, the Company and the union both communicated with the picketers through Mitchell. Mitchell received three calls from the union during the strike, and delivered the union's messages that the strike was illegal, in violation of the contract, and not sanctioned by the union. Mitchell also told the strikers that the union wanted them to go back to work and that they should go back to work so that they would not be discharged. They refused.

Mitchell and all of the picketers were requested individually by the Company to return to work, and they all refused. Mitchell delivered the same request to the picketers on behalf of the Company, and it was again refused.

At no time during the course of the strike did Mitchell urge the employees to remain on strike. Instead, he urged the employees to return to work or, at the least, seek legal counsel.

Immediately preceding and during the course of the strike, Mitchell was in telephone contact with union stewards in other company plants in which the same reclassification/demotion policy had been instituted. The stewards discussed the situations in their respective plants, but Mitchell at no time requested the stewards or the employees they represented to strike or otherwise support the walkout at his plant.

On the last day of the strike, after being informed that the Company would seek an injunction, Mitchell and several employees visited an attorney. When the Company obtained the injunction late that day, an employee informed Sheehan that the employees, on the advice of counsel, were ready to return to work. The next day Mitchell informed Sheehan that he was

ready to return. Thereafter, the Company informed the employees that it did not condone the strike and would conduct an investigation. Mitchell then resigned as union steward.

The Company interviewed only Mitchell about the strike and declined another employee's offer to answer questions. When Sheehan asked a plant supervisor if he thought Mitchell had led the walkout, the supervisor responded that he did not think so. Twelve days after the strike ended, Mitchell was discharged by Sheehan and vice-president Heist.

After the Mitchell discharge, Heist met with the unit employees and informed them, according to one of the employees, that "nobody else would be condemned for their actions during the strike but Mike Mitchell was fired because he was the man that held the position of union steward at that time, and he had to get rid of somebody, that Mike held the position." At that point, an employee stated that "it wasn't right" because Mitchell had not been the leader of the strike. Heist responded, stating that that made no difference because Mitchell held the "position" and, therefore, he was the one that had to be fired.

*ISSUE ON REVIEW:*

The sole issue presented by the parties on this appeal is:

Whether the discharge of an employee who participated in an illegal work stoppage constitutes a violation of section 8(a)(3) and (1), where the discharge is based solely upon the fact that the employee was the union steward, and where the employee participated only reluctantly in the strike and attempted to dissuade the employees from striking.

We answer in the affirmative.

*DISCUSSION:*

At the time of the strike and Mitchell's discharge, the union and the Company were parties to an industry-wide collective bargaining agreement which contained, *inter alia*, the following provisions:

Article VIII Stewards

Section 1. The Union shall have the right to appoint one chief shop steward ... [who] shall be [and employee] covered by this Agreement ...

2. Section 8(a)(3) prohibits employers from "discrimination in regard to hire or tenure of employment or any term or condition of em-

Section 2. The steward's duties shall consist of seeing that all terms and conditions of the Agreement are being complied with ...

\*   \*   \*   \*   \*   \*

Article XXI Dispute/Grievance Procedure:

Section 5. There shall be no strike or lockout, slowdown, interference, or work interruption on any job over any grievance or dispute while it is being processed through this grievance procedure, and until the said procedure has been exhausted. If any employees engage in any such activity, they may be disciplined by management without recourse *except to establish that they actually participated in or were a part of such activity* [emphasis supplied] ....

The Board, through the adoption of the ALJ's finding, concluded that by disciplining only Mitchell out of the 25 strikers, not because of his actions as an employee or his role in the strike, but solely because he was a union official, the Company violated sections 8(a)(3) and (1) of the Act.[2]

The Company contends nevertheless that it could lawfully discharge Mitchell even if he was only a mere participant in the strike. This argument principally relies upon two cases: *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979), and *Gould Inc. v. NLRB*, 612 F.2d 728 (3d Cir. 1979), *cert. denied, Moran v. Gould Corp.*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980).

*Indiana & Michigan Electric Co.* involved a wildcat strike at a public utility in violation of a collective bargaining agreement provision that the employees would "not be called upon or permitted to cease or abstain from the continuous performance of the duties pertaining to the positions held by them ...." 599 F.2d at 228. The employees went out on strike and were joined by five union officials who left work falsely claiming that they were ill. That afternoon three of the striking officials joined in an effort to end the strike. The next morning all the strikers returned to work.

The Electric Company, by suspending the union officials for from one to three days, disciplined them more harshly than the rank and file employees, who received only ployment to encourage or discourage membership in any labor organization ...."

written warnings. This court, in denying enforcement of the Board's order, first noted that where the employer's discriminatory conduct is "inherently destructive" of important employee rights, no proof of anti-union motivation is needed to establish a § 8(a)(3) violation. *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 33, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). On the other hand, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an anti-union motivation must be proved. *Id.* at 34, 87 S.Ct. at 1797–98.

The *Indiana & Michigan Electric Co.* court found that there was no evidence of anti-union motivation, and thus the question was whether the suspensions were inherently destructive of important employee rights.[3] The court noted that "[t]he more severe punishment was not based merely on the officials' status but upon their breach of the higher responsibility that accompanies that status, a breach that makes their misconduct more serious than that of the rank-and-file," 599 F.2d at 230. The court found that, until recently, the Board had recognized that the higher responsibilities of union officials justify disciplining them more severely for participation in unprotected activity, and that the Board had erred in rejecting that position in *Precision Casting Co.*, 233 NLRB No. 35 (1977), and *Gould Corp.*, 237 NLRB No. 124 (1978).

The Third Circuit followed suit in denying enforcement of the Board's order in *Gould Inc. v. NLRB*, 612 F.2d 728. That case involved a union steward who was singled out for disciplinary discharge out of fifty striking employees. The court found, however, that he was not fired solely because he was a steward, but because he "participated in an illegal strike and failed to perform his contractual obligation to take positive steps to halt that work stoppage." 612 F.2d at 733. The collective bargaining agreement there specifically required union officers to publicly disavow illegal work stoppages and to order the members to return to work.

■ In the instant case, there appears to be no finding that the discharge had anti-union motivation, and thus the issue is whether the discharge was "inherently de-

structive" of employee rights. If the discharge was "not based merely on the officials' status but upon their breach of the higher responsibility that accompanies that status," *Indiana & Michigan Electric Co.*, 599 F.2d at 230, then it is not inherently destructive of employee rights.

The *Indiana & Michigan Electric Co.* decision did not define exactly what that "higher responsibility" is or from whence it arises. The Board here contends that Mitchell met any higher responsibilities incident to his union office by attempting to dissuade the employees from striking both before and throughout the strike, and by his actions as mediator between the employees, the Company, and the union. The Board contends that the "higher responsibility" should not include an obligation to cross a picket line which is honored by the vast majority of the employees, because crossing the line would cause the steward to lose both credibility and the ability and opportunity to mediate a resolution of the strike. Conversely, the Company contends, rather unrealistically, that if the steward crossed the line, the strike might end.

The collective bargaining provision in *Gould Inc.*, quoted above, were quite specific and would alone be sufficient to impose a higher responsibility upon the union officials to end the strike. In *Indiana & Michigan Electric Co.*, however, the contractual provisions were less specific, reciting only that the employees' services were essential to the operation of a public utility, and that the employees would not be "called upon or permitted" to strike.

■ The contractual basis for the union steward's "higher responsibility" in this case is even more tenuous than in *Indiana & Michigan Electric Co.* Here, besides the no strike clause, the contract contained only one other relevant provision which imposed upon the stewards the duty of "seeing that all terms and conditions of this Agreement are being complied with."

The Board contends that Mitchell met his obligations under this provision by attempting to dissuade the employees from striking, and that the provision did not impose upon him a "higher responsibility" to cross the picket line. By contrast, only three of the five union officials in *Indiana & Michigan*

---

**3.** We emphasize the inherently less destructive *suspensions* in *Indiana & Michigan Electric Co.* from the *discharge* in the present case.

*Electric Co.* attempted to persuade the employees to stop the strike, and they did so only belatedly.

The Board's argument is persuasive. While *Indiana & Michigan Electric Co.* noted that a union steward's mere "presence" among illegal strikers may provide "active approval and encouragement," 599 F.2d at 231 n.9, no such conclusion can be drawn in this case as Steward Mitchell repeatedly attempted to dissuade the strikers, not belatedly, but throughout the strike. In the absence of a clear contractual provision requiring Mitchell to cross the picket line, his efforts were sufficient, if not the most effective possible, to satisfy his obligation to see that the no strike clause was complied with.

We will not construe *Indiana & Michigan Electric Co.* so broadly as to permit the Company's action here. Mitchell did just about everything possible to end a strike which he had tried to prevent, except to cross the picket line. To have taken that extra step would have been suicidal to his union stewardship and his capacity to enforce any provision of the bargaining contract.

The Company stated that Mitchell was fired not because he was thought to be a leader of the strike, but solely because he. was the union steward. Clearly, the Company's action was destructive of Mitchell's right to hold union office.

The Company contends, however, that the evidence demonstrated that its action was not inherently destructive of employee rights *in general,*[4] and thus that it did not violate § 8(a)(3) and (1) of the Act. *Indiana & Michigan Electric Co.,* 599 F.2d at 230. We disagree. It is not necessary that an affirmative showing be made that the employees have in fact been deterred from exercising their protected rights. The coercive effects of the type of action here are often subtle, and it is frequently difficult, if not possible, to verify the impact upon the willingness of the employees in general to hold union office or to engage in other protected activities. It is sufficient that the employer's actions have a substantial tendency to discourage employees from holding union office or engaging in other protected activities.

4. The Company presented evidence that Mitchell's successor as shop steward had been undet-

 In this case, Mitchell was discharged not because he breached any "higher responsibilities" imposed upon him incident to his union office, but solely because he was the union steward during the strike. We conclude that, in these circumstances, the discharge had a substantial tendency to discourage employees in general from holding union office, and was, therefore, inherently destructive of the employees' protected rights.

The evidentiary record clearly supports the findings of fact of the ALJ and the Board, and we approve the Board's conclusions of law.

The Company's petition for review is denied, and the Board's order is enforced.

ENFORCED.

erred from filing grievances by Mitchell's discharge.