**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BABCOCK AND WILCOX COMPANY, Respondent.**

**No. 80–1527.**

United States Court of Appeals, Sixth Circuit.

Argued Dec. 10, 1981.

Decided Jan. 10, 1983.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., Andrew Tranovich, Cleveland, Ohio, for petitioner.

Richard V. Sica, Richard I. Thomas (argued), Thorp, Reed & Armstrong, Pittsburgh, Pa., for respondent.

Before ENGEL and KENNEDY, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

ENGEL, Circuit Judge.

The National Labor Relations Board ("the Board") petitions for enforcement of its Order, reported at 249 NLRB 739 (May 23, 1980), requiring Babcock and Wilcox Company to rectify its 1977 discharge of employee Alpheus Stanford. At the time of his discharge, Stanford was on disability leave from his job at the Company's Alliance, Ohio plant, and had recently applied for retirement. The Board's Order requires the Company to change Stanford's status from "discharged" to either "retired" or "retired on disability", and to correct its personnel records accordingly. The Order is based upon the Board's finding that the Company violated section 8(a)(1) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), by discharging Stanford under the mistaken belief that he joined with other employees in an illegal strike against the Company. We enforce the Board's Order.

Before his discharge, Stanford was President of Local 3059, United Steelworkers of America, which represented approximately 400 hourly employees at the Company's Alliance plant. Section XXIII of the collective bargaining agreement then in effect contained a no-strike clause, violation of which was punishable by discharge:

> During the term or any extended term of this Agreement, the Union will not cause a strike nor will any employee or employees take part in a strike, intentional slowdown in the rate of production, or any other interference with, or stoppage of the Company's work. Any employees who so violate this Agreement shall be subject to immediate discharge....

It is undisputed that from March 15 to March 20, 1977, the employees at the Alliance plant engaged in a strike in violation of the no-strike agreement. It is also undisputed that Stanford had no part in organizing the strike. The strike began when six non-employee union activists came to Alliance from Cleveland and set up a picket line at the entrance to the plant. The Company's employees refused to cross the picket line, and a five-day general work stoppage followed.[1] After the strike ended, the Com-

---

1. The arbitrator who upheld Stanford's discharge prior to the proceedings before the Board found that the outsiders from Cleveland gave no reason to the employees for their picketing. However, the arbitrator also found that outsiders were members of a dissident group within the union known as the "Steelworkers Organizing Committee." According to the arbitrator, this group opposed the International Union's policy of negotiating with employers

pany disciplined those employees believed to have led the strike. Nine employees, including Stanford, were discharged, four employees were suspended without pay from 7 to 14 days, and six employees received warning letters.

Stanford and the other eight discharged employees pressed their grievances to arbitration, the final stage of a five-step grievance procedure established by the collective bargaining agreement. Section XVIII of the Agreement provides that the decision of the arbitrator "shall be final". After a three-day hearing, the arbitrator upheld Stanford's discharge, finding that he participated in the illegal strike. Specifically, the arbitrator found that Stanford might have been able to use his influence to stop the strike but "clearly did nothing to stop [it] and instead adopted the strike", and that Stanford "was the only local union officer who openly supported the strike."

Stanford next filed an unfair labor practice charge with the Board, claiming that he did not participate in the illegal strike and that he was therefore discharged for engaging in union activities protected by section 7 of the Act. The Administrative Law Judge ("ALJ") held a full evidentiary hearing and rejected the arbitrator's findings of fact and decision. He independently held that "Stanford did not instigate, participate [in], or adopt [the] illegal walkout." In a 2–1 decision, the Board adopted the factual findings of the ALJ that Stanford "had no significant role either in the planning or the execution of the strike", 249 NLRB at 740, and that his discharge therefore violated section 8(a)(1) of the Act.

In reaching its decision, the Board applied the standards first articulated in *Spielberg Mfg. Co.*, 112 NLRB 1080 (1955), and refused to defer to the arbitrator's contrary finding of Stanford's adoption and support of the illegal strike. In *Spielberg*, the Board held that it would refuse to exercise its statutory power to remedy unfair labor practices, *see* 29 U.S.C. § 160(a), and defer to the award of an arbitrator when:

> the [arbitration] proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act.

*Spielberg Mfg. Co., supra,* 112 NLRB at 1082. In this case, however, the Board found the arbitrator's decision to be "clearly repugnant to the purposes and policies of the Act", and therefore unworthy of deferral under *Spielberg*. The Board found that to the extent the arbitrator's decision was based upon or influenced by Stanford's failure to take affirmative steps to end the strike, it was inconsistent with the Board's decision in *Gould Corp.,* 237 NLRB 881 (1978), in which the Board held that union officials may not be disciplined for their mere failure to attempt to end an illegal strike. 249 NLRB at 740. The Board also disregarded the arbitrator's findings that Stanford "adopted" and "openly supported" the strike, on the ground that they were not supported by "substantial evidence" and therefore repugnant to the Act.[2] It therefore ordered Stanford's reinstatement.

In opposing enforcement, the Company argues first that the Board erred in even deciding this case because Stanford failed to file his unfair labor practice charge with the Board within six months after the practice occurred, as required by section 10(b) of the Act, 29 U.S.C. § 160(b). Second, the Company claims that the Board abused its discretion in refusing to defer to the factual findings of the arbitrator. Finally, argues the Company, the Board's independent find-

---

for no-strike provisions in new contracts. Also, evidence was presented to the arbitrator that at the time of the strike several employees were concerned about safety problems in the plant. It therefore appears that the picket line was begun by outsiders, and later joined by Company employees, as either an expression of support for the dissident faction of the union or a protest over working conditions at the plant, or both.

2. Member Penello dissented from the Board's decision not to defer to the arbitration award because he found the award to be "based on a reasonable reading of the evidence presented to the arbitrator and ... not wholly at odds with the Act." 249 NLRB at 741 (footnote omitted).

ing that Stanford played no role in the strike is itself not supported by substantial evidence.

## I.

Section 10(b) of the Act, 29 U.S.C. § 160(b), provides that "no complaint shall issue based upon any unfair labor practice *occurring* more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made . . . ." (emphasis added). This six months filing limit is "a statute of limitations and not a restriction on the jurisdictional powers of the Board." *NLRB v. Local 264, Laborer's Int'l Union*, 529 F.2d 778, 785 (8th Cir.1976).

It is undisputed that Stanford filed his unfair labor practice charge with the Board on September 26, 1977, and that the statutory notice was served upon the Company the following day. Therefore, the alleged unfair labor practice must have "occurred" on or after March 27, 1977, in order for Stanford's charge to be timely under the statute. The Company's theory is that Stanford was "disciplined" on March 24, 1977, when he was suspended prior to being discharged, and that any unfair labor practice occurred on that date. Further, the Company urges that March 24 should be the relevant date because that is when Stanford first knew that he would be discharged.

When the Company's actions against Stanford are measured against the procedures in the collective bargaining agreement in effect at the time of Stanford's suspension and discharge, it appears that the alleged unfair labor practice did not occur until at least March 28, 1977, and that Stanford's unfair labor practice charge was therefore timely filed and served. Under the agreement, Stanford's March 24 suspension was neither a discharge nor a final decision by the Company of any kind; it was merely a tentative first step by the Company toward imposing discipline upon Stanford. Section XVI of the collective bargaining agreement provided that a union member "shall not be preemptorily discharged". Instead, the Agreement sets forth an elaborate procedure by which the Company must first suspend the employee for not more than five days, during which the employee is entitled to a hearing before the Company. Only after such a hearing may the Company make its final decision:

> After such hearing, the Company may conclude whether the suspension shall be converted into discharge, or dependent upon the facts of the case, that such suspension may be extended or revoked. If the suspension is revoked, the employee shall be returned to employment and receive full compensation at his regular rate of pay for the time lost . . . .

After the Company's personnel manager orally informed Stanford on March 24 that he was being suspended for five days "subject to discharge", Stanford promptly demanded a discharge hearing. The hearing took place on March 25. It was not until March 28 that the Company gave Stanford oral notice of its decision to discharge him. This decision was not to be effective until March 30, 1977, and in fact it was not until March 30 that Stanford received in the mail the Company's written notice of his discharge. The Company's March 24 suspension of Stanford therefore had no significance, especially since Stanford was on disability leave at the time of the suspension and was not working anyway. Had the Company decided not to discipline Stanford after the hearing of March 25, the effects of Stanford's initial suspension would have been fully remedied by backpay and a lifting of the suspension pursuant to the terms of the collective bargaining agreement. Stanford therefore had no unfair labor practice to complain of to the Board until at least March 28, 1977.[3] His unfair labor

---

3. It is noteworthy that the Company's Answer to the Regional Director's Complaint in this case specifically controverted the Board's allegation that "[o]n or about March 25, 1977, [the Company] discharged and/or terminated the employment of [Stanford]", by alleging that "Alpheus L. Stanford was discharged on March 30, 1977 . . . ." This evidences the Company's early recognition that Stanford's initial suspension date of March 24, 1977, is not the date on

practice charge, filed with the Board on September 26, 1977, and served upon the Company on September 27, 1977, was therefore timely.

## II.

The Company argues that the Board abused its discretion by refusing to defer to the arbitration award upholding Stanford's discharge, although it concedes that the Board has considerable discretion to set the standards by which it will decide when to defer to an arbitration award. *See, e.g., Hawaiian Hauling Service, Ltd. v. NLRB,* 545 F.2d 674, 676 (9th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977) (Board has "wide discretion"); *NLRB v. Horn & Hardart Co.,* 439 F.2d 674, 679 (2d Cir.1971) (such Board discretion is "large"). The Supreme Court has quoted the following holding by the Board with approval:

> [I]t is . . . well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.

*Carey v. Westinghouse Electric Corp.,* 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964) (dictum), *quoting International Harvester Co.,* 138 NLRB 923, 925 (1962), *enf'd. sub. nom. Ramsey v. NLRB,* 327 F.2d 784 (7th Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964).

■ Nevertheless, the Company challenges the Board's finding that the arbitrator's award in this case is "clearly repugnant to the purposes and policies of the Act" and therefore unworthy of deferral under the Board's *Spielberg* test.[4] In determining whether the Board properly applied its *Spielberg* test in refusing to defer to the arbitrator, our inquiry is limited to whether the Board has abused its discretion. *See, e.g., Herman Bros., Inc. v. NLRB,* 658 F.2d 201, 207 (3rd Cir.1981); *Hawaiian Hauling Service, Ltd. v. NLRB,* 545 F.2d 674, 676 (9th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977); *Associated Press v. NLRB,* 492 F.2d 662, 666 (D.C. Cir.1974); *NLRB v. Auburn Rubber Co.,* 384 F.2d 1, 3 (10th Cir.1967); *Ramsey v. NLRB,* 327 F.2d 784, 787–88 (7th Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964).

### A

The Company advances two arguments to support its claim that the Board abused its discretion in refusing to defer to the arbitrator's decision.

which the unfair labor practice "occurred". It was only later, before the ALJ, that the Company raised any question about the relevant date of Stanford's discipline.

4. The Company does not challenge the validity of the Board's *Spielberg* deferral doctrine itself, and does not challenge the Board's implicit holding in this case that an arbitrator's award is "clearly repugnant to the purposes and policies of the Act" under *Spielberg* when that award is either (1) erroneous as a matter of law because it is inconsistent with Board policy or court decisions under the Act, or (2) not supported by substantial evidence. Certainly the Board has discretion to disregard arbitration awards which are based on errors of law, *see, e.g., St. Luke Memorial Hospital v. NLRB,* 623 F.2d 1173, 1178 (7th Cir.1980); *Hawaiian Hauling Service, Ltd. v. NLRB,* 545 F.2d 674, 676–77 (9th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977); *Dreis & Krump Mfg. Co. v. NLRB,* 544 F.2d 320, 329 (7th Cir.1976), but the question of whether the Board may refuse to defer to an arbitration award merely on the grounds that it is unsupported by substantial evidence is more difficult. The Board's "substantial evidence" review of arbitration awards is a rather recent innovation and has been used sparingly by the Board. *See Illinois Bell Telephone Co.,* 221 NLRB 989, 991 (1975); *Kansas City Star Co.,* 236 NLRB 866, 868–69 (1978) (Member Truesdale, concurring); *American Bakeries Co., Inc.,* 249 NLRB 1249, 1251 n. 8 (1980). *But see Atlantic Steel Co.,* 245 NLRB 814, 814 n. 2 (1979). At least one commentator has argued that the Board does not consistently apply the substantial evidence standard of review to arbitral fact findings, but instead often employs a *de novo* review of the evidence in reaching its deferral decision. *See* Note, *Limiting Deferral Under the Spielberg Doctrine,* 67 Va.L.Rev. 615, 621 (1981). Because the Company does not challenge the Board's substantial evidence standard, we need not decide whether the use of such a standard by the Board amounts to an abuse of discretion under the Act.

■ First, the Company argues that the ALJ refused to defer to the arbitration award on the erroneous ground that the award was not supported by a preponderance of the evidence. Instead, it insists, the ALJ should have applied a "substantial evidence" test in his review of the arbitrator's decision. We agree with the Company that the ALJ applied the wrong standard of review in making his deferral decision. However, the Board, whose order and decision we review in this appeal, did not make the same error. Instead, the Board clearly based its refusal to defer on the absence of substantial evidence to support the arbitral fact findings.

The Company next argues that substantial evidence in fact supports the arbitrator's finding that Stanford "adopted" and "openly supported" the illegal strike in violation of the collective bargaining agreement, and that for this reason even though the Board might disagree it ought to have deferred. A careful review of the record convinces us the Board was well within its discretion in refusing to defer.

■ As the Board noted, the arbitrator did not specifically explain the factual basis upon which he concluded that Stanford adopted and openly supported the strike. In the course of describing the events of the strike, however, the arbitrator made numerous basic findings concerning Stanford's activities during the strike. We find ourselves bound to agree with the Board that none of the specific facts found by the arbitrator relating to Stanford's conduct

during the strike provides any evidence of substance that he participated in that strike.[5] In short, the arbitrator, albeit a well-seasoned observer of the labor scene, found himself relying simply on intuition.

It is undisputed that at the time of the illegal strike Stanford was on disability leave from his job at the plant, so that his mere failure to work during the strike is not evidence of his participation in the strike. It is also undisputed that Stanford was present at the picket lines and speaking to the striking employees at various times during the strike. This, however, is completely consistent with Stanford's claim that he tried throughout the strike to persuade the men to go back to work.

In our opinion, there are only four incidents found by the arbitrator which even arguably might constitute substantial evidence of Stanford's participation in the strike. The first two incidents arose out of a meeting held by the union on March 16, 1977, on the second day of the strike. The meeting was called to discuss the strike and was well attended by the union membership. Stanford and the other union officers presided. The arbitrator found that during the meeting various employees spoke at length about a list of safety-related grievances they had and that the employees present at the meeting ultimately adopted a resolution supporting the strike. The arbitrator did not find that Stanford took part in the discussion of safety grievances nor that he had anything to do with the resolution adopting the strike. However, the ar-

---

**5.** We reject the Company's claim, raised for the first time at oral argument, that the Board abused its discretion in conducting its substantial evidence review without having a transcript of the arbitration hearing before it. Our review and analysis indicates that the Board properly concluded that none of the basic facts found by the arbitrator and appearing on the face of his decision constitutes substantial evidence to support his ultimate conclusion that Stanford "adopted" and "openly supported" the strike. No reference to the arbitration transcript is necessary in this case because, with the exception explained in note 7 *infra* (which requires reference only to an exhibit which all parties agree was before both the arbitrator and the Board), the basic evidentiary facts

found by the arbitrator are not disputed. Rather, the arbitrator's ultimate factual conclusion does not follow from his subsidiary factual findings; the arbitration award is in this sense "facially unsound". *Cf. NLRB v. Owners Maintenance Corp.*, 581 F.2d 44, 49 (2d Cir. 1978) (Board is not required to indulge mere "speculation" by an arbitrator).

We recognize, of course, that when the Board goes behind the face of the arbitration decision and holds basic findings of fact by an arbitrator to be unsupported by substantial evidence, it must base its review upon the record before the arbitrator. In such cases, the record generated by a *de novo* hearing before an ALJ can be no substitute for the arbitration record since the two records could be quite different.

bitrator found that "[i]t is significant that as a result of the meeting on March 16, Stanford sent a Complaint against the Company to OSHA . . . outlining each of the safety violations complained of by [the employees at the meeting]." One might conceivably view this as a sign of support by Stanford for the strikers, but our reading of the arbitrator's decision convinces us that he found Stanford's filing of the OSHA complaint "significant" only for reasons wholly unrelated to the issue of Stanford's strike participation.[6] In any event, we find Stanford's filing of a safety complaint with the appropriate federal agency to be fully consistent with his claim that he was at all times during the strike only attempting to persuade his men to go back to work. We are reluctant in the extreme to uphold a finding that the filing of the OSHA complaint, even though it took place during the strike, supports any inference of an intent to continue the illegal strike.

A second result of the March 16 union meeting was that a telegram, signed by Stanford, was sent to the Company. The arbitrator quotes the telegram in full without specifying whether it influenced his decision about Stanford. Considering the telegram in its entirety, we conclude that while it strongly expressed the views of the striking union members, it carefully distinguished between the views of the rank-and-file and the views of the union officers. The first sentence of the telegram clearly expresses the *opposition* of Stanford and the other union officers to the strike:

> "*The officials* of Local 3059 USWA wish to inform the Company that the work stoppage at the B & W Alliance Plant has been declared illegal and unauthorized and have requested the members to re-turn to work. *The membership* refused to accept anymore of D.A. Edgecomb's harassing and intimidating practices. D.A. Edgecombe essentially caused the action which was undertaken by the membership of Local Union 3059 and its officers hold D.A. Edgecombe, Plant Manager, responsible for the work stoppage."

(emphasis added). We are unwilling to read between the lines of the telegram and infer that it somehow meant the opposite of what it said, especially when the arbitrator's own view of it was so ambiguous. Such a reading is simply too speculative for the telegram to be considered substantial evidence of Stanford's adoption and support of the strike.

The third finding of the arbitrator of possible relevance concerns a hearing held in state court on the Company's motion for a preliminary injunction against the illegal strike, held on March 18. The arbitrator found that Stanford "acted as spokesman for the Union" at this hearing. He also found that "all through this hearing there was no attempt to get the employees back to work but rather the entire emphasis was placed on trying to continue the strike", and that Stanford "sought to prevent the issuance of [an] injunction." We find it unremarkable that the president of a local union would act as spokesman and legal representative for the union in a legal proceeding which he was compelled by subpoena to attend. There is nothing in the arbitrator's decision to indicate that Stanford did anything more than explain the rank-and-file point of view to the state judge. There is no finding by the arbitrator that Stanford deviated from the position so

---

6. Stanford's discharge had been grieved jointly with eight rank-and-file employees who had also been discharged (but who admitted participating in the strike). These other employees defended merely on the ground that a discharge was too severe a punishment for their striking. The arbitrator, whose single written decision covered all nine grievances, appeared to reject this argument primarily on the ground that the employees had no real cause for striking, but instead "trumped up grievances which had actually never been present in order to cloak their individual guilt." The arbitrator reached this conclusion after finding that an inspection of the plant by OSHA officials, conducted in response to Stanford's complaint, revealed that the safety complaints raised by the striking employees were without merit. Stanford's filing of the OSHA complaint, then, appears to have been "significant" to the arbitrator only as part of the proof that employee safety grievances were "trumped up" and could not be used to mitigate the discipline of the rank-and-file strikers.

clearly spelled out in the telegram he signed and sent to the Company; namely that he and the rest of the union leadership did not authorize the strike, declared the strike illegal, and requested the members to return to work. Indeed, even the arbitrator found that "[d]uring the hearing at which the injunction was issued, Stanford promised the judge to hold a mass meeting of all employees to order the men back to work." [7]

Finally, the arbitrator found that before the strike ended Stanford "attempted to negotiate a no-retaliation clause for going back to work but the Company refused to agree to any such condition and the strike continued." When viewed in the context of the record as a whole, including the telegram sent by Stanford to the Company clearly expressing the union leadership's opposition to the strike, this action by Stanford can fairly be viewed as nothing more than an effort to facilitate an ending of the strike. Rather than negotiating with the Company over the striking employees' safety grievances, and thereby advancing the strikers' cause, Stanford here acted as more of a neutral mediator, proposing an idea to the Company by which the employees might have been induced to return to work without the need for any action by the Company on the safety complaints. Viewed in this light, Stanford's no-retaliation suggestion to the Company is fully consistent with his position as stated in the March 16 telegram to the Company that he was opposed to the strike and was urging the union members to return to work.

It may well be that Stanford telegraphed in some subjective, subliminal way his support of the strike to the other employees, but we are unable to point to any part of the record which provides substance to this conclusion. The facts here are unique since

normally a union officer's tacit support of a strike can be substantiated by his failure to cross the picket line and failure to go to work. Here, of course, Stanford was on disability leave and not working; there is simply no showing that he ever respected the picket line or even had occasion to be tested by its presence. While perhaps it might not have taken much evidence of this nature to reinforce the arbitrator's suspicions, even that is lacking.

Having carefully reviewed the record and the opinion of the arbitrator, we conclude that the Board did not abuse its discretion in finding the arbitration award to be unsupported by substantial evidence, and there unworthy of deferral.

### B

We note that the Company does not challenge the Board's finding that the arbitrator committed an error of law in reaching his decision.[8] We consider this issue, however, because we view it as an alternative reason for upholding the Board's deferral decision. The arbitrator appears to have assumed that Stanford's position as president of the local union imposed upon him a duty to take affirmative steps to end the illegal strike. Citing its decision in *Gould Corp.*, 237 NLRB 881 (1978), the Board rejected this legal assumption by the arbitrator. In *Gould Corp.*, the Board held that union officials may not be disciplined merely for their failure to attempt to stop an illegal strike. The Third Circuit denied enforcement of the Board's order in *Gould*, holding that a union steward who participated in an illegal strike could be disciplined more severely than other illegal strikers where the collective bargaining agreement required the steward to take

7. The arbitrator found that the meeting Stanford promised the state judge he would hold was never held. We agree with the Board that the arbitrator appears to have overlooked evidence before him that such a meeting was in fact held and resulted in a vote by the union members to return to work. *See* 249 NLRB at 739 n. 1. In any event, Stanford's failure to call a union meeting after having promised the state judge on March 18 to do so would not be

substantial evidence of Stanford's adoption of the strike in light of the arbitrator's finding that by March 16, "the local [union] officers had completely lost control" of the striking union members, who had "turned into a mob."

8. Nor did the Company rely on the assertedly erroneous aspect of the arbitration decision in its argument before the Board.

specific affirmative steps in the event of an illegal strike and where the steward failed to take such action. *Gould, Inc. v. NLRB,* 612 F.2d 728 (3rd Cir.1979), *cert. denied sub nom., Moran v. Gould Corp.,* 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). On the facts of this case, however, we agree with the Board that the arbitrator erroneously imposed an affirmative duty upon Stanford to end the illegal strike.

Since its decision denying enforcement in *Gould, supra,* the Third Circuit has made it clear that union officials do not have any duty to take affirmative action against illegal strikes unless there is "clear language" imposing such duties in the applicable collective bargaining agreement. *Metropolitan Edison Co. v. NLRB,* 663 F.2d 478, 482–83 (3rd Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982).

■ In the case before us the Company fails to point to any language in the collective bargaining agreement which even arguably imposes any affirmative duty on the union officials to attempt to end illegal strikes. We agree with the Third Circuit that local union officials have no such duty absent clear language to the contrary in the collective bargaining agreement.[9]

The arbitrator's decision upholding Stanford's discharge relied very heavily upon Stanford's failure to exert his influence to end the illegal strike. That decision therefore is premised upon a duty which Stanford did not in fact have, and therefore is infected by an error of law. The arbitrator wrote:

> Stanford is the President of the local and is primarily responsible for exerting his influence in getting the men back to work. . . . However, Stanford might have been able to stop the strike [when the non-employee picketers left the plant] if he had shown any determination to do so. He clearly did nothing to stop the strike and instead adopted the strike and sought to prevent the issuance of [a preliminary] injunction. He was the only local union officer who openly supported the strike from March 16 to March 21 when the employees finally returned to work.

We believe that the Board might well have held the arbitrator's error of law alone to be sufficient reason to refuse to defer to his finding that Stanford adopted and openly supported the strike. As already mentioned, the arbitrator does not specifically explain the factual basis upon which he concludes that Stanford adopted and openly supported the strike. These conclusory factual findings appear immediately after the arbitrator describes Stanford's failure to stop the strike. It therefore appears that these findings may be partially or completely dependent upon the arbitrator's erroneous assumption that Stanford had an affirmative duty to end the strike. It is quite plausible to argue that the arbitrator found Stanford to have adopted and openly supported the strike simply because in his view Stanford stood by and did nothing to end

---

9. Our holding may conflict with the present rule in the Seventh Circuit. That court appears to hold that union officials have a greater responsibility for illegal strikes by virtue of their leadership positions, as a matter of law rather than as a matter of specific collective bargaining agreement provisions. In *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227 (7th Cir.1979), the court found that a union official's status is automatically accompanied by a "higher responsibility" for obeying contractual no-strike provisions, 599 F.2d at 230, so that when union officials participate in an illegal strike the employer is "entitled to take into account the union official's greater responsibility *and hence greater fault,* and . . . the resulting different treatment of union officials could not be reasonably considered inherently de-

structive of important employee rights." 599 F.2d at 232 (emphasis added). A later Seventh Circuit case, however, appears to question this proposition on the grounds that "[t]he *Indiana & Michigan Electric Co.* decision did not define exactly what [the Union officers'] 'higher responsibility' is or from whence it arises." *C.H. Heist Corp. v. NLRB,* 657 F.2d 178, 182 (7th Cir.1981) (dictum). Whatever the Seventh Circuit rule may be with regard to the "higher responsibility" of union officials to obey a contractual no-strike clause, we refuse to impose an affirmative duty on the union official to take steps to end a strike *which he has not organized or joined* when the parties to the collective bargaining agreement themselves have not seen fit to expressly create such a duty.

the strike. Of course, we cannot tell from reading the arbitrator's decision how greatly the error of law influenced the ultimate finding of Stanford's participation in the strike. We cannot reconstruct the mental processes of the arbitrator, but we do know that a material error of law was committed. Under these circumstances, we believe the Board would have been fully justified in refusing to defer to the arbitration award solely on the ground of the error of law.

### III.

Having reviewed the record as a whole, we conclude that substantial evidence supports the finding of the Board that Stanford "had no significant role either in the planning or the execution of the strike", and that the Company therefore violated section 8(a)(1) of the Act by discharging Stanford "because of an erroneous belief that, while engaged in protected activities associated with his office of union president, he had instigated the strike and promoted it within the Union." 249 NLRB at 740 (footnote omitted). In so concluding, we reject the Company's attack on certain credibility determinations made by the ALJ, for the reasons stated by the Board in its decision. *See* 249 NLRB at 740 n. 8.

Accordingly, the Board's Order is EN-FORCED.

CELEBREZZE, Senior Circuit Judge, concurring.

I agree with the majority's conclusion that Stanford filed his unfair labor practice charge within the period provided by the statute of limitations and that the National Labor Relations Board properly refused to defer to the arbitrator's decision. I cannot agree, however, with the majority's conclusion that the principal union representative owes no affirmative duty to discourage an unlawful strike absent clear language to the contrary in the collective bargaining agreement. The majority reasons that a general no-strike provision in the collective bargaining agreement does not contain sufficiently clear language from which an af-

firmative duty may be implied. In my opinion, a general no-strike clause obligates the principal union representative to inform the rank-and-file that the union opposes the strike and that the strike violates the collective bargaining agreement. Further, I believe that such a duty is not impermissibly destructive of the right to hold union office.

A collective bargaining agreement represents a contractual arrangement between union and management which obligates both to act according to its terms. *See, e.g., Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 567, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1043 (1960); *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957); *Complete Auto Transit v. Reis,* 451 U.S. 401, 418, 101 S.Ct. 1836, 1846, 68 L.Ed.2d 248 (1981) (Powell, J., concurring). Consequently, a union is obligated by the terms of a no-strike in a collective bargaining agreement to refrain from striking or supporting a strike during the life of that agreement. *See, e.g., Buffalo Forge Co., v. Steelworkers,* 428 U.S. 397, 407, 96 S.Ct. 3141, 3147, 49 L.Ed.2d 1022 (1976); *Atkinson v. Sinclair Refining,* 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 1581 (1962). A union's ability to discharge this obligation, however, often depends upon the conduct of union officials. *Complete Auto Transit v. Reis, supra,* 451 U.S. at 418, n. 1, 101 S.Ct. at 1846, n. 1 (Powell, J., concurring). *See, Schimman v. Frank,* 625 F.2d 80, 94 (6th Cir.1980) ("Unions, like corporations and other artificial entities, can act only through their agents"). If the no-strike clause is to be accorded any practical effect, an agent of the union must assume the union's responsibilities. *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227, 228, 230 (7th Cir.1979); *Cf. NLRB v. Armour-Dial, Inc.,* 638 F.2d 51, 56 (8th Cir.1981) (union officials tacit approval of unlawful strike viewed as leadership). Failure to impose such an obligation would effectively permit the union to disregard its obligations under the collective bargaining agreement and would leave the employer without an effective means of assuring the enforce-

ment of no-strike provisions.[1] *Complete Auto Transit v. Reis,* 451 U.S. at 420–423, 101 S.Ct. at 1847–48 (Powell, J., concurring). Therefore, the principal union representative assumes, as incident to his office, the duty to discharge the union's obligation pursuant to the no-strike clause, the principal union representative must, on behalf of the union, inform the rank-and-file that the strike is unlawful and opposed by the union.

Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(1), (3) protect the employee's right to hold union office and limit the employer's right to lawfully discharge union officials.[2] Although the right to hold union office is central to employee organizational rights,[3] an employer may legitimately burden that right so long as he acts without anti-union animus. Several rules have been developed by the Supreme Court regarding proof of anti-union animus. If the employer's action is "inherently destructive" of the employee's right to hold union office, then anti-union animus is conclusively presumed. *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). If, however, the employer's action has only a "comparatively slight" burden upon the employee's Sec. 7 rights, then the employer may escape the presumption's effect by producing "evidence of legitimate and substantial business justification for his conduct." *Id.*

The obligation that I would impose is not "inherently destructive" of the employee's right to hold union office. No court which has considered this question in a similar context has found that the imposition of such a duty upon a union official is inherently destructive of the right to hold union office. *E.g., Hammermill Paper Co. v. NLRB,* 658 F.2d 155, 162–63 (3rd Cir.1979); *Gould, Inc. v. NLRB,* 612 F.2d 728 (3rd Cir.1979); *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227, 230 (7th Cir.1979). The duty posited here requires only that the principal union representative state the unlawful nature of the strike and disavow union sponsorship; the duty would not require, absent express contractual language,

---

1. In *Complete Auto Transit, Inc. v. Reis,* 451 U.S. at 420, 101 S.Ct. at 1847, Justice Powell noted that alternative employer remedies for an unlawful strike such as injunctive relief, discharge of strikers, a request that the union impose disciplinary action, and a suit against the union, are often illusory. By imposing upon a union official an affirmative obligation to discharge the union's obligations pursuant to no-strike clauses, the employer is provided a more effective means of deterring unlawful activity. Moreover, employees often look to the union for leadership and guidance; thus, requiring a union official to state the union's official opposition to an unlawful strike may encourage employees to forgo unlawful activity. *See, Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227, 230 (7th Cir.1979); *Gould, Inc. v. NLRB,* 612 F.2d 728, 733 (3rd Cir.1979). Finally, a rule that clearly defines the union's obligations during a wildcat strike protects union officials from a charge that their tacit approval of union members' unlawful conduct amounts to leadership justifying more severe punishment. *See, NLRB v. Armour-Dial, Inc.,* 638 F.2d 51, 56 (8th Cir.1981).

2. Sections 8(a)(1) and (3), 29 U.S.C. Secs. 158(a)(1) and (3) provide, in pertinent part:
   (a) Unfair labor practices by employer
   It shall be an unfair labor practice for an employer—

   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Sec. 157 of this title;
   (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
   
   \* \* \* \* \* \*
   
   A Sec. 8(a)(3) violation represents a derivative violation of Sec. 8(a)(1) when the employer's conduct adversely affects employee rights. Consequently, the same mode of proof is required in establishing a violation of either section. *NLRB v. Jemco, Inc.,* 465 F.2d 1148, 1152, n. 7 (6th Cir.1972).

3. A strike which violates a no-strike provision in the collective bargaining agreement is not protected activity within the meaning of Sec. 7 of the National Labor Relations Act. *E.g., Plasti-Line, Inc. v. NLRB,* 278 F.2d 482 (6th Cir.1960). Consequently, a union official's allegation that an employer's action infringes upon Sec. 7 rights, must be founded upon the right to hold union office. *E.g., Metropolitan Edison Co. v. NLRB,* 663 F.2d 478, 482 (3rd Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982); *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227, 230 (7th Cir. 1979).

union officials to cross picket lines.[4] *Metropolitan Edison Co. v. NLRB,* 633 F.2d 478, 582, n. 3 (3rd Cir.1981), *cert. granted,* —— U.S. ——, 102 S.Ct. 2926, 73 L.Ed.2d 1327 (1982); *C.H. Heist Corp. v. NLRB,* 657 F.2d 178, 183 (7th Cir.1981). Consistent with these authorities, a duty which requires a union official to inform the rank-and-file that a strike is unlawful and opposed by the union gives meaning to no-strike provisions without having an inherently destructive effect upon an employee's right to hold union office. Furthermore, even if the duty posited has a comparatively slight effect upon employees' right to hold union office, such a minimal burden is justified.[5] Generally, if an employer's action could result in some burden on protected activity, the employer must justify his conduct in light of a substantial and legitimate business interest. *E.g., NLRB v. Jemco, Inc.,* 465 F.2d 1148 (6th Cir.1972). Clearly, the employer's interest in uninterrupted production is substantial and legitimate; the union implicitly recognizes this when it waives its right to engage in concerted activity by agreeing to a no-strike clause.[6] *See Complete Auto Transit v. Reis, supra,* 451 U.S. at 418–19, 101 S.Ct. at 1846 (Powell, J., concurring); *Fournelle v. NLRB,* 670 F.2d 331, 341 (D.C.Cir.1982) (the effective administration of bargaining agreements is a substantial and legitimate business purpose).

Substantial evidence on the record as a whole supports the Board's conclusion that union president Stanford was improperly discharged. Although I disagree with the Board's conclusion that president Stanford owed no affirmative duties during the unlawful strike, the Board's findings indicate that Stanford discharged the union's obligations owing under the collective bargaining agreement by declaring the strike illegal and informing the rank-and-file of its unlawful nature.[7] For this reason, I join in enforcing the Board's order requiring reinstatement and awarding backpay.

---

4. Such a requirement would substantially affect both a union officer's effectiveness as a union representative and employee willingness to seek union office. *See Fournelle v. NLRB,* 670 F.2d 331 (D.C.Cir.1982) (specific contractual language imposing additional obligations, however, may result in a valid waiver of employees' Sec. 7 rights).

5. Once the union's obligations are discharged by the principal union representative, employers must treat all employees in a fair and consistent manner. Although an employer may subsequently choose to discharge some or all of the employees involved in an unlawful strike, the employer's decision may not be based upon improper considerations. *See NLRB v. Fansteel Metallurgical Corp.,* 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939).

6. If the employer produces evidence that a substantial and legitimate interest supports his action, then the presumption of anti-union animus is rebutted and the employee must produce specific evidence of anti-union animus to sustain an unfair labor practice charge. *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967).

7. Normally, the principle union representative, whether his title is president or chief steward, must discharge the union's obligations under the no-strike clause. When special circumstances, such as incapacity, prevent the principle union representative from discharging the union's obligations, the responsibility may be delegated to another union official.