NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0497n.06

No. 21-3369

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

NORFOLK SOUTHERN RAILWAY
COMPANY,

      Petitioner,

v.

UNITED STATES DEPARTMENT OF
LABOR, ADMINISTRATIVE REVIEW
BOARD,

      Respondent,

SCOTTY LANCASTER,

      Intervenor.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Dec 02, 2022
DEBORAH S. HUNT, Clerk

ON PETITION FOR REVIEW FROM AN
ORDER OF THE ADMINISTRATIVE
REVIEW BOARD

OPINION

Before: STRANCH, DONALD, and THAPAR, Circuit Judges.

STRANCH, J., delivered the opinion of the court in which DONALD, J., joined. THAPAR, J. (pp. 24–30), delivered a separate dissenting opinion.

JANE B. STRANCH, Circuit Judge. Scotty Lancaster, a locomotive engineer for Norfolk Southern Railway Company (NSRC), was ultimately suspended without pay for 40 days after he raised concerns that an order from the Assistant Trainmaster would cause a violation of the Hours of Service Act. He submitted a complaint to the Occupational Safety and Health Administration (OSHA), claiming that NSRC violated the Federal Railway Safety Act's (FRSA) whistleblower provisions by disciplining him. OSHA initially dismissed the complaint. However, an Administrative Law Judge (ALJ) concluded that Lancaster's claim had merit, and, on appeal, the

Administrative Review Board (ARB or the Board) affirmed that ruling. NSRC challenges the ARB's order. We **DENY** the petition for review.

## I.   BACKGROUND

### A.   Factual Background

On November 26, 2015, Lancaster was working with the conductor, Thomas Combs, on a "hot" locomotive (the term for a locomotive carrying valuable freight, making it a high priority delivery). While the train was stopped at the Shelbyville Mixing Center in Shelbyville, Kentucky, a third-shift utility worker reached his maximum allowable work hours for the day, and the first-shift utility worker had not yet arrived to take over. As a result, Combs and Lancaster delayed the freight train for approximately 45 minutes to wait for the utility worker to arrive.

Because the locomotive was "hot," the Division Superintendent, Carl Wilson, instructed Assistant Trainmaster Matthew Newcomb to personally observe the locomotive to ensure that there were no delays. When Newcomb noticed that the train was stopped for a long period of time, he became alarmed and boarded the train to speak with Lancaster and Combs. During the heated conversation, Newcomb told Lancaster and Combs that they should not have simply waited for the utility worker to arrive, but instead, should have performed the utility worker's tasks themselves. He instructed them to do so immediately to avoid further delay.

Fairly new to his role, Newcomb called his supervisor, Trainmaster Dominique Reese, to make sure that he did the right thing. Reese advised him to investigate the incident and obtain written statements from Combs and Lancaster. Newcomb returned to the train and told Combs and Lancaster that they would be "handled," meaning disciplined for delaying freight, but, to avoid any further delay, they were to continue working and deal with the problem later.

The next day, Combs and Lancaster began their shifts at 4:30 a.m. At about 4:15 p.m.—when Combs and Lancaster had 15 minutes remaining in their maximum 12-hour shift—Newcomb ordered them into his office and instructed them to write a statement describing the prior day's events. Both Combs and Lancaster told Newcomb that they were concerned that providing the statement could take more than 15 minutes and cause NSRC to violate the Hours of Service Act, which requires that a railroad refrain from allowing its employees "to remain or go on duty for a period in excess of 12 consecutive hours," 49 U.S.C. § 21103(a)(2). And, in any case, Newcomb was aware that Combs and Lancaster's hours of service deadline was coming up at 4:30 p.m.

Combs began work on the statement, but Lancaster requested permission to speak with his union representative before agreeing to complete the statement. Newcomb gave Lancaster permission to do so, and, at about 4:21 p.m., Lancaster stepped away to make the call to his union representative, Travis Cochrane. During their call, Lancaster explained his concern and asked if he needed a union representative to be physically present. Cochrane ultimately advised Lancaster to complete the statement. At 4:34 p.m., Lancaster returned to find that Newcomb had also stepped out and that Combs was still working on his statement, which he did not complete until 4:47 p.m., seventeen minutes beyond his permitted 12 hours of service.

While Lancaster stepped out to talk to his union representative, Newcomb called Assistant Division Superintendent, Shannon Mason, to discuss what transpired. Mason instructed Newcomb to remove Lancaster from service. When Newcomb returned, Lancaster said that he was ready and willing to fill out the statement. Newcomb, in response, told Lancaster that he was being removed from service—effectively, a suspension without pay—pending an investigation for his refusal to provide the statement.

The removal from service triggered the formal disciplinary procedures set out in the collective bargaining agreement (CBA) that governed Lancaster's employment. Under the CBA, Lancaster is entitled to written notice of the alleged rule violation and a formal evidentiary hearing. On December 4, NSRC sent Lancaster a written notice, charging him with insubordination for failing to follow directions from Newcomb regarding the delay on November 26 and for conduct unbecoming for his interaction with Newcomb. A formal hearing took place on December 11 and 22. On January 5, 2016, the hearing officer issued his decision, finding Lancaster responsible for the charged violations and imposing a 40-day suspension, retroactive to his initial suspension imposed on November 27, 2015. As a result of the unpaid suspension, Lancaster lost a total of $12,599.51 in gross income.

### B.     Proceedings Below

On June 8, 2016, Lancaster submitted a complaint to OSHA, alleging that NSRC violated the whistleblower provision of the Railway Safety Act by disciplining him in retaliation for refusing to violate the Hours of Service Act. Following an investigation, OSHA dismissed the complaint on November 6, 2017. OSHA's findings were sent only to Lancaster's attorney, and not to Lancaster himself.

On February 6, 2018, Lancaster filed objections to OSHA's dismissal and requested a hearing before an ALJ. NSRC moved to dismiss Lancaster's appeal as untimely. The ALJ denied that motion, reasoning that OSHA's regulations require it to send findings to both parties and counsel. Because Lancaster was never mailed the findings and NSRC did not claim any prejudice from the delay, the ALJ concluded that the time period for objections did not start to run until both parties and their counsel received OSHA's findings. So, the filing was timely. NSRC sought reconsideration and certification of an interlocutory appeal, which the ALJ denied.

On December 3 and 4, 2018, the ALJ held a hearing on the merits and issued a decision and order, finding that NSRC retaliated against Lancaster in violation of the FRSA. The ALJ found credible Lancaster's testimony that he made Newcomb aware of his concerns about exceeding his hours of service before initially refusing to complete the statement and requesting to speak to his union representative. The ALJ also noted that Newcomb knew, or should have known as a supervisor, that Lancaster's hours of service limit was approaching. And, based on Combs' testimony, the ALJ found it probable that completing the written statement would take more than 15 minutes. The ALJ concluded that it was "objectively reasonable for [Lancaster] to be uncertain whether he could finish the written statement demanded by Newcomb before 4:30 p.m." Because the Hours of Service requirement concerns railroad safety, the ALJ held that Lancaster's initial refusal to compose the written statement amounted to protected activity under the FRSA—an action in good faith to refuse to violate a federal law relating to railroad safety.

Having established that Lancaster engaged in protected activity, the ALJ found that Lancaster was disciplined in response: he was initially disciplined by immediate suspension, and following the hearing pursuant to the CBA, his discipline was finalized and specified to be a 40-day suspension. NSRC provided "no alternative theory" to show that it would have made the same decision in the absence of Lancaster's protected activity. Consequently, the ALJ found that NSRC violated the FRSA and awarded back pay, emotional distress damages, punitive damages, and litigation costs to Lancaster.

NSRC appealed the ALJ's decision to the ARB. The Board reviewed the case and issued a decision and order, affirming the ALJ's decision in its entirety. This appeal followed.

## II.    DISCUSSION

NSRC disputes several aspects of the Board's decision—the timeliness of Lancaster's initial complaint to OSHA and his objections to OSHA's investigative findings; the substantive merits of the retaliation claim; and the decision to award punitive damages.  We address the arguments in turn.

### A.    Standard of Review

Review of the ARB's decision is governed by the Administrative Procedure Act (APA), 49 U.S.C. § 20109(d)(4).  We review the ALJ's findings of fact—as affirmed by the Board—under a deferential standard, setting them aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); *Hoffman v. Solis*, 636 F.3d 262, 268 (6th Cir. 2011).  We review the Board's legal determinations de novo.  *See Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rel. Auth.*, 464 U.S. 89, 97 n.7 (1983).  In reviewing legal determinations, however, the Court defers to the Board's interpretation of the statute to the extent provided in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

### B.    Timeliness

NSRC contests the timeliness of Lancaster's initial filing of his OSHA complaint and Lancaster's appeal to the ALJ.

#### 1.    OSHA Complaint

We first consider the timeliness of Lancaster's initial complaint to OSHA.  The Act requires a complaint to be filed within 180 days of the adverse employment action. 49 U.S.C. § 20109(d)(2)(A)(ii).

NSRC contends that the ALJ and the Board found that the retaliatory act occurred only on November 27, 2015, and neither found that the imposition of the suspension on January 5, 2016, constituted a retaliatory act. So, NSRC argues, November 27, 2015, is the date relevant for the purposes of filing the initial complaint to OSHA, and Lancaster's complaint—filed on June 8, 2016—is untimely. In support of its argument, NSRC points to *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002), and *Sasse v. U.S. Department of Labor*, 409 F.3d 773, 783 (6th Cir. 2005), contending that the November 27, 2015, action was discrete from the January 5, 2016, action. Taking a somewhat different twist, NSRC also points to *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980), claiming that the January 5 decision was a "delayed" effect of Lancaster's removal on November 27. NSRC seeks to compare the statutory and collective bargaining issues here to the termination of an employee at the end of a one-year employment contract entered into after the employee was denied tenure in *Ricks*, 449 U.S. at 258.

At issue here is whether the adverse employment action occurred on November 27, 2015— when Lancaster was initially removed from service pending an investigation—or on January 5, 2016—when Lancaster's discipline was specified and finalized. As is often the case in our labor jurisprudence, the key is the governing CBA.

Under the CBA, we have little difficulty finding that the adverse employment action relevant for the filing of the OSHA complaint occurred on January 5, 2016. As the ALJ noted, a retaliatory action occurred on November 27, 2015, but Lancaster's discipline was not finalized until January 5, 2016. Importantly, the actions on November 27, 2015, triggered the investigation process specified in this CBA—which the employer is required to undertake *before* issuing any discipline. Here, the CBA specified that NSRC must have completed certain preliminary procedures before taking any disciplinary action. That required procedure was not completed until

the hearing officer issued the final decision notifying Lancaster of the specific discipline being imposed on him. Under the CBA, Lancaster's cause of action accrued on that date—January 5, 2016. As the Board noted, Lancaster "was immediately removed from work pending an investigation and formally penalized on January 5, 2016," and therefore "timely filed his complaint with OSHA."

Our dissenting colleague acknowledges that the CBA is not irrelevant, but still contends that "the Act—not the CBA—dictates what rights Lancaster has and when he can exercise them." Dissenting Op. at 26. First, our analysis is based on the FRSA itself, § 20109(h), which instructs that we cannot read the FRSA "to diminish the rights, privileges, or remedies of any employee under any . . . collective bargaining agreement." 49 U.S.C. § 20109(h). As a result, we cannot apply the FRSA in a manner that diminishes the parties' negotiated disciplinary process and deprives Lancaster of the benefit of the bargained-for due process procedures. The dissent's approach, moreover, is at odds with long-standing precedent recognizing that "special heed should be given to the context in which collective bargaining agreements are negotiated and the purpose which they are intended to serve." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960). A CBA is "more than a contract" because it is intended "'to erect a system of industrial self-government' that permits the relationship between the parties to be 'governed by an agreed-upon rule of law.'" *See Bhd. of Locomotive Engineers & Trainmen v. United Transp. Union*, 700 F.3d 891, 899 (6th Cir. 2012) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960)). Accordingly, here, the CBA sets forth the parameters for "investigations and discipline," and establishes the rights and responsibilities of both parties to the Agreement. This CBA's governing requirements cannot be waived unless the employee accepts responsibility for his actions under Section B.2.a of the CBA. In all other instances,

"[a]n employee shall not be discharged, suspended, or otherwise disciplined without just cause and without a fair and impartial hearing."

We see this principle illustrated in other labor contexts as well. For example, in *NLRB v. Babcock & Wilcox Co.*, 697 F.2d 724 (6th Cir. 1983), we held that an employee's initial suspension pending the outcome of bargained-for disciplinary procedures was *not* the relevant action that triggered the six-month filing deadline for unfair labor practice charges under the National Labor Relations Act. *See id.* at 727. Instead, the employer's final disciplinary decision—made after an initial suspension, notice, and hearing, pursuant to a CBA—was the relevant action. This is because under the CBA in *Babcock*, an employee could not be discharged unless and until the employer followed an "elaborate" notice-and-hearing procedure. *Id.* "Only after such a hearing may the Company make its final decision." *Id*. Likewise, this CBA requires a "fair and impartial hearing" before an employee is "suspended or otherwise disciplined." The relevant action was thus the final decision issued by the hearing officer on January 5, 2016, after the bargained-for disciplinary process concluded.

Because the CBA specifies additional protections for Lancaster to which NSRC must adhere, NSRC's argument that the final decision to suspend him from service on January 5, 2016, was a discrete or delayed act from the action that Lancaster suffered on November 27, 2015, makes little sense. In support of its discrete act argument, NSRC relies on *Morgan* and *Sasse*, but those cases are readily distinguishable because they involved separate adverse employment actions that the employees incurred over the course of several months or years. *Morgan*, 536 U.S. at 114–15; *Sasse*, 409 F.3d at 777. Here, by contrast, the disciplinary process was initiated on November 27, 2015, but the adverse employment action was not finalized or conveyed until January 5, 2016.

Nor was this a delayed act, as in *Ricks*, 449 U.S. at 257–58. NSRC sent Lancaster the required charge letter on December 4, 2015, explaining that his conduct was "under investigation," the purpose of which was to "develop the facts and [determine his] particular responsibility, if any," for his alleged acts of November 27, 2015. The investigation process culminated on January 5, 2016, when NSRC gave notification to Lancaster of the adverse employment actions imposed through the CBA procedures. From that date Lancaster had 180 days to file a complaint with OSHA. The ARB correctly concluded that Lancaster's initial complaint to OSHA was timely filed.

The dissent criticizes the CBA's due process procedures, claiming that they leave FRSA-covered employees with "no rights under the Act until their employer makes a 'final decision,'" Dissenting Op. at 24, and positing lengthy employer-created delays, *id.* at 27. But using commonly employed CBA provisions, this CBA provides specific timeframes that NSRC must follow. For example, the employer is required to provide notice of a hearing no more than ten days after the "occurrence," that triggered the disciplinary process, and the hearing "shall not be . . . more than ten (10) days after the date of notification unless otherwise agreed to." Moreover, "[i]f the formal hearing results in assessment of discipline, such decision shall be rendered within fifteen (15) calendar days from the date the hearing is concluded." NSRC cannot "drag out" an investigation because the parties to this CBA agreed to prohibit such conduct. And more generally, employers are disincentivized from delaying an investigation because, if it turned out that the employer wrongfully retaliated against the employee, the employer would have substantially increased its backpay liability, which would be part of a remedy available under either the CBA or 49 U.S.C. § 20109. The dissent also emphasizes that Lancaster "was sent home without pay" while the investigation process played out. Dissenting Op. at 27. But this, too, is part of the negotiated

procedure mandated by the CBA. Section A.2 of the CBA provides that an employee may be "held from service pending hearing" in "serious cases, such as . . . . insubordination." Of course, "[w]hen an employee involved in a formal hearing is not assessed discipline, the employee shall be compensated for all time lost" and "reimbursed for actual, reasonable and necessary expenses incurred for each day of the hearing."

In sum, the dissent overstates the implications of our narrow ruling, which are tethered to the FRSA, the governing CBA, and the facts of this record. We do not hold that an employee has no rights until discipline is finalized, or that an employee can *never* file a complaint sooner. *See* Dissenting Op. at 26–27. We hold only that Lancaster's complaint was timely in light of the FRSA, particularly § 20109(h), and the due process requirements the parties negotiated for inclusion in the CBA's disciplinary procedures.

### 2. ALJ Appeal

NSRC also challenges the timeliness of Lancaster's objections to OSHA's findings dismissing his charge. It contends that the ALJ and the Board erred in finding Lancaster's objections timely, arguing they incorrectly determined that notice to Lancaster and his attorney was required under the statute. NSRC argues that the statutory obligation was fulfilled because Lancaster received constructive notice on November 13, 2017—when his attorney received OSHA's findings—and his filing of objections on February 6, 2018, was untimely.

The whistleblower protection provision of the FRSA, at issue here, expressly incorporates the rules and procedures set forth in 49 U.S.C. § 42121(b), the Wendell H. Ford Aviation Investment Act for the 21st Century (AIR-21). 49 U.S.C. § 20109(d)(2)(A). By incorporation, the FRSA provision governing the time period for filing objections to the Secretary of Labor's findings and hearing requests provides:

> Not later than 60 days after the date of receipt of a complaint filed under paragraph (1) and after affording the person named in the complaint an opportunity to submit to the Secretary of Labor a written response to the complaint and an opportunity to meet with a representative of the Secretary to present statements from witnesses, the Secretary of Labor shall conduct an investigation and determine whether there is reasonable cause to believe that the complaint has merit *and notify, in writing, the complainant* and the person alleged to have committed a violation of subsection (a) of the Secretary's findings . . . . Not later than 30 days after the date of notification of findings under this paragraph, either the person alleged to have committed the violation or the complainant may file objections to the findings or preliminary order, or both, and request a hearing on the record . . . . If a hearing is not requested in such 30-day period, the preliminary order shall be deemed a final order not subject to judicial review.

49 U.S.C. § 42121(b)(2)(A).

We begin with the plain language of the statute. By any plain reading of this text, notice is thus proper when notification is given, in writing, to the complainant. The statute does not provide for constructive notice through counsel, and therefore, we do not read into the statute an interpretation that otherwise departs from the plain reading of the text. *See Nat'l Leadburners v. O.G. Kelley Co.*, 129 F.3d 372, 375 (6th Cir. 1997) ("Absent ambiguity or a result that is demonstrably at odds with legislative intent, statutory provisions must be accorded their plain meaning.").

> The governing regulations comport with that understanding, providing:

> The findings and, where appropriate, the preliminary order will be sent by means that allow OSHA to confirm delivery to all parties of record (and each party's legal counsel if the party is represented by counsel).

29 C.F.R. § 1982.105(b).

We give "substantial deference to an agency's interpretation of its own regulations," *Crestview Parke Care Ctr. v. Thompson*, 373 F.3d 743, 750 (6th Cir. 2004), limited to when the interpretation is not "plainly erroneous or inconsistent with the [published] regulation," *id.* (alteration in original) (quoting *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 944 (6th

Cir. 2000)). Given our conclusion that the plain language of the statutory text is clear, we need not defer to the Agency's regulations, however, the regulations may still be instructive in confirming our interpretation of the statutory text. *See, e.g.*, *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 986–87 (6th Cir. 2009) (concluding that plain language of statute was clear, but relying on persuasive authority, including the Agency's regulations, to confirm its conclusion); *Saginaw Chippewa Indian Tribe v. Blue Cross Blue Shield*, 32 F.4th 548, 560–61 (6th Cir. 2022) (same).

As a preliminary matter, NSRC challenges the applicability of this regulation, contending that it only "sets out how OSHA should issue or send its findings," not whether "notification" was proper under the statute. But that argument overlooks fundamental principles of administrative law. For notice to be proper, the agency must adhere to the procedure required by its statute and implementing regulations. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004) (providing that "it is an elemental principle of administrative law that agencies are bound to follow their own regulations" and an agency's action that fails to observe the procedures required by its own regulations should be set aside). For notification to be sufficient to trigger the clock under 49 U.S.C. § 42121(b)(2)(A), OSHA must have followed the procedure required by its own statute and implementing regulations.

To give effect to the language of the regulation, as both the ALJ and the Board concluded, the findings must be sent to *both* the parties of record *and* each party's legal counsel. The use of the word "and" is interpreted in the conjunctive, meaning that notice to the parties *and* notice to the attorneys must be satisfied. *See OfficeMax, Inc. v. United States*, 428 F.3d 583, 589 (6th Cir. 2005). The statute and the governing regulations, therefore, clearly support the reading applied by the ALJ and the Board.

NSRC contends that these principles contravene well-established caselaw in the employment discrimination context that suggests constructive notice satisfies the statutory notification requirements. In *Irwin v. Department of Veteran Affairs*, the Supreme Court grappled with a Title VII provision stating, "an employment discrimination complaint against the Federal Government . . . must be filed '[w]ithin thirty days of notice of final action taken' by the EEOC." 498 U.S. 89, 92 (quoting 42 U.S.C. § 200e-16(c)). The Court reasoned that this language "requires only that the EEOC notification letter be 'received'; it does not specify receipt by the claimant rather than by the claimant's designated representative." *Id.* It concluded that constructive notice was permissible in light of the broad, non-specific language in Title VII. The plain language of the statute, buttressed by the implementing regulations, provide more specific instructions than those in the Title VII provision in *Irwin*: the statute here specifies that notification is to be made "in writing, [*to*] *the complainant*," 49 U.S.C. § 42121(b)(2)(A), and the regulations specify, consistent with the statutory text, that notification is to be made to both the complainant and counsel, *see* 29 C.F.R. § 1982.105(b). Given these crucial differences between the general language of Title VII and the specificity of the FRSA and its implementing regulations, the ALJ and the ARB properly implemented the governing notice requirements.[1]

We turn to the decision of the ALJ and the Board, which concluded that the objections raised were timely. NSRC argues that OSHA's adherence to this procedure "does not somehow convey on Lancaster a right to ignore his statutory obligation to file objections within the 30 days of notification of the findings." It concludes that, to hold otherwise "would mean *hundreds* of

---

[1] Our dissenting colleague disagrees, concluding that *Irwin* is applicable because Congress did not provide specific instruction in the statute that it intended to "depart from the common and established practice of providing notification through counsel." Dissenting Op. at 29–30 (citing *Irwin*, 498 U.S. at 93). Missing from this analysis, however, is any discussion of the statutory text, which explicitly specifies "the complainant" as the recipient of the Secretary of Labor's findings. 49 U.S.C. § 42121(b). And the "filing of objections and findings" at issue here hinges on those "notification of findings." *Id.* *Irwin* is distinguishable.

whistleblower cases would effectively be free of any deadline for filing objections under any of the myriad of statutes where this regulatory language is present" and would create "a loophole contrary to the legislative intent of ensuring finality."

As explained above, however, when an agency fails to follow its own procedural framework provided in its statute and regulations, that agency action is improper. *See Wilson*, 378 F.3d at 545–46. It is, moreover, "well established that an agency has the discretion 'to relax or to modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it.'" *Spitzer Great Lakes Ltd. v. EPA*, 173 F.3d 412, 415 n.3 (6th Cir. 1999) (quoting *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970)). Here, where the ALJ and Board found no prejudice to NSRC in treating the complaint as timely, and where OSHA itself erred by not following its procedures—as the ALJ and Board found—the Agency acted squarely within its discretion by allowing the objections to move forward. As to NSRC's concerns, we note that today's ruling is narrow and does not have the broad implication of nullifying the statutory deadline for filing objections that NSRC suggests. Critical to the Agency's decision to find the objections timely and our conclusion that the Agency acted within its discretion, is the fact that NSRC asserted no prejudice in litigating the case. On this record, the Agency acted within its discretion in selecting the best recourse following a procedural error on its part during its own administrative proceedings.

## C.    Retaliation Claim

The ALJ found, and the Board agreed, that Lancaster's initial refusal to provide a statement was based on his good faith, reasonable belief that doing so would violate the Hours of Service Act's requirements. According to the Board, Lancaster's reasonable belief that Newcomb's order would cause a violation of the Hours of Service Act—a statute concerned with railroad workers'

safety—constituted protected activity within the meaning of the FRSA. And when NSRC suspended him for engaging in that protected activity, it violated 49 U.S.C. § 20109(a)(2). NSRC contests several of the Board's factual findings and legal conclusions.

We begin with an overview of the framework of retaliation claims under the Act. The FRSA provides that:

> [a] railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act, or perceived by the employer to have been done or about to be done to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security.

49 U.S.C. § 20109(a)(2).

The "Federal law" related to railroad safety at issue here is the Hours of Service Act, which was enacted by Congress "to promote the safety of employees and travelers upon railroads by limiting the hours of service of employees and by requiring railroads to provide crew members with a certain number of off-duty hours for rest between shifts." *Bhd. of Locomotive Eng'rs v. Atchison, Topeka & Santa Fe. R.R. Co.*, 516 U.S. 152, 153–54 (1996). "The statute, in effect, makes the determination that a train employee who remains on duty for more than 12 consecutive hours will be too fatigued to operate a train in a safe manner." *Id.* at 157. To that end, the Hours of Service Act instructs that "[a] railroad carrier and its agents may not require a train employee to remain on duty for a period in excess of 12 consecutive hours." 49 U.S.C. § 21103(a)(2). Railroad companies are responsible for compliance and are expected to "schedule operations and crew assignments with some precision, for if operations require the crew to be on duty for more than 12 hours, the railroads may incur substantial penalties." *Bhd. of Locomotive Eng'rs*, 516 U.S. at 154. Because the statute concerns railway safety, if a railroad carrier disciplines an employee

due to his or her "lawful, good faith act . . . to refuse to violate" the Hours of Service Act, that discipline can constitute retaliation in violation of the FRSA. 49 U.S.C. § 20109(a)(2).

AIR-21 governs the burdens of proof concerning retaliation claims under the FRSA. 49 U.S.C. § 42121(b). To prevail on a claim, an employee must first show by a preponderance of the evidence that he or she (1) engaged in protected activity; (2) the employer took adverse employment action; and (3) the protected activity was a contributing factor in the adverse employment action. *See Palmer v. Canadian Nat'l Ry.*, No. 16-035, 2016 WL 5868560, at *9 (Dep't of Lab. Admin. Rev. Bd. Sept. 30, 2016); *Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 475–76 (5th Cir. 2008). For the "contributing factor" element, the employee need only show that an activity "alone or in combination with other factors, tends to affect in *any* way the outcome of the [employer's] decision." *Palmer*, 2016 WL 5868560, at *31 (emphasis in original). Once the employee establishes these three elements, the burden shifts to the employer to prove "by clear and convincing evidence" that it would have taken the same unfavorable personnel action in the absence of that protected behavior. *Id.* at *33. If the employer satisfies its burden, then it is absolved of all liability under the statute. 49 U.S.C. § 42121(b)(2)(B)(iv).

NSRC first claims that the ALJ's use of the phrase "protected 'disclosure,'" pertains to a different statutory provision and contends that the ALJ and the Board's decisions must fail as a matter of law. But we are tasked with reviewing the Board's decision affirming the ALJ, "not the ALJ's decision itself." *See Conley v. Nat'l Mines Corp.*, 595 F.3d 297, 301 (6th Cir. 2010). The Board clearly construed the ALJ's decision and Lancaster's underlying complaint as a retaliation claim—that NSRC retaliated against Lancaster, for engaging in protected activity by refusing to provide the written statement out of concern that it would cause a violation of the Hours of Service

Act. We therefore review the Board's decision on that retaliation claim, regardless of the ALJ's inclusion of some less than precise language.

NSRC next addresses its challenges to the Board's factual findings and legal conclusions. It first asserts that the Board's finding that Lancaster engaged in protected activity is not supported by substantial evidence because Newcomb was never made aware of the concern about a potential Hours of Service Act violation. The record shows that Lancaster testified about telling Newcomb that his hours of service were expiring. The ALJ found his testimony to be credible, particularly noting that Combs's testimony provided corroboration. We do not disturb credibility findings unless the findings have "no rational basis." *CON-AG, Inc. v. Sec'y of Lab.*, 897 F.3d 693, 702 (6th Cir. 2018) (quoting *Fluor Daniel v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003)). NSRC does not argue that the ALJ erred in determining that Lancaster was credible, instead it points to other statements that it says contradict Lancaster's testimony. But "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Sasse*, 409 F.3d at 778 (quoting *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir. 2002)). The record called for the ALJ to make credibility determinations and weigh the evidence, and the ALJ acted within his province in doing so on this issue. This alone defeats NSRC's argument.

More to the point, however, NSRC's argument as to how specifically Lancaster made Newcomb aware of the potential Hours of Service violation is inapposite. As the ALJ correctly stated, the critical question is "whether Newcomb was aware that the hours of service of Complainant and Combs were about to expire, and that Newcomb nonetheless directed Complainant and Combs to write their statements." The record makes it clear that Newcomb knew. Not only did both Combs and Lancaster make him aware, as they testified, but, Newcomb,

as a supervisor, had been trained on the Hours of Service Act requirements. His job duties required him to be aware that Lancaster and Comb's permitted hours were expiring. In light of Newcomb's knowledge, Lancaster's refusal to engage in conduct that would violate the Hours of Service Act falls within the scope of the FRSA's protected activity. There is no error in the Board's decision on this point.

Next, NSRC challenges the Board's conclusion that Lancaster's initial refusal to provide a written statement was a contributing factor in NSRC's decision to discipline him. As noted earlier, a contributing factor is one which "alone or in connection with other factors, tends to affect in *any* way the outcome of the decision." *Consol. Rail Corp. v. U.S. Dep't of Lab.*, 567 F. App'x 334, 338 (6th Cir. 2014) (emphasis added) (quoting *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 158 (3d Cir. 2013)). NSRC argues for a different standard—that Lancaster must additionally prove "intentional retaliation prompted by the employee engaging in protected activity," and he failed to do so here. *Dakota, Minn. & E. R.R. Corp. v. U.S. Dep't of Lab.*, 948 F.3d 940, 942 (8th Cir. 2020) (quoting *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014)). This misapprehends the correct legal standard. "A prima facie case does not require that the employee conclusively demonstrate the employer's motive." *Kuduk*, 768 F.3d at 790 (alteration in original) (quoting *Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)); *see also Lockheed Martin Corp. v. Admin. Rev. Bd.*, 717 F.3d 1121, 1137 (10th Cir. 2013). Rather, as our sister circuits have explained, "the employee need only make 'a prima facie showing that protected behavior or conduct was a contributing factor in the unfavorable personnel action alleged in the complaint.'" *Coppinger-Martin*, 627 F.3d at 750 (quoting 29 C.F.R. § 1980.104(b)); *see also Kuduk*, 768 F.3d at 791; *Consol. Rail Corp.*, 567 F. App'x at 338; *Ameristar Airways, Inc. v. U.S. Dep't of Lab.*, 650 F.3d 562, 569–70 (5th Cir. 2011).

In any event, NSRC chiefly contends that Lancaster did not establish "intentional" retaliation because the ALJ found that Newcomb and Mason "did not even consider Lancaster's protected conduct when they removed him from service." While it may be true that Newcomb and Mason did not expressly state that they considered Lancaster's concerns regarding the Hours of Service Act, NSRC's argument misses the point. The fact remains—and NSRC has not shown otherwise—that Newcomb, who took the initial steps of disciplining Lancaster, knew that Lancaster refused to comply due to his concerns about the violation of the Hours of Service Act. At that point, Lancaster's refusal—which constituted protected activity—was not only a contributing factor to, but was the sole reason for, Lancaster's discipline. NSRC has failed to meet its burden to show that the Board erred as a matter of law or that the record did not adequately support its factual findings on this point.

Finally, NSRC disputes the Board's conclusion that NSRC failed to demonstrate it would have taken the same action in the absence of Lancaster's protected refusal to provide a written statement. NSRC contends that the ALJ applied a theory previously rejected by the Board and courts—that the protected action and the action for which Lancaster was disciplined were "inextricably intertwined." That theory involves circumstances, for example, in which an employee is required to fill out a report (under safety rules and regulations), and as part of making that report, the employee makes a disclosure that prompts some disciplinary action. *See, e.g.*, *Dakota, Minn. & E. R.R. Corp.*, 948 F.3d at 946. Courts have taken issue with such a theory because it is well-established under the FRSA and other workplace safety laws that "employees cannot immunize themselves against wrongdoing by disclosing it in" the course of required safety measures. *BNSF Ry. v. U.S. Dep't of Lab.*, 816 F.3d 628, 639 (10th Cir. 2016).

That theory has no relevance here. As shown above, NSRC took action against Lancaster for refusing to submit a written statement at the time when doing so would cause him to exceed his permitted hours. And Newcomb knew that. NSRC did not say that the written statement had to be completed at that moment to comply with federal or state safety regulations, much less its own workplace safety rules. Indeed, Newcomb himself chose to delay collecting the written statement on the prior day. This is not a situation where Lancaster was required to provide the statement in that moment and was disciplined for the disclosure within the statement—an example of what would be "inextricably intertwined" conduct. Rather, he was disciplined for refusing to engage in an activity that would put him in violation of the Hours of Service Act. We thus find no merit to NSRC's argument.

NSRC failed to provide any other evidence that it would have taken the same action against Lancaster in the absence of his refusal to provide the statement when asked to do so at 4:15 p.m., based on his concerns over the Hours of Service Act. We find no error in the Board's factual findings or legal conclusions regarding this part of the analysis.

In light of the foregoing analysis, and having found no merit to NSRC's challenges concerning the substance of the retaliation claim, we find no error in the Board's ultimate determination that NSRC violated the Act when it disciplined Lancaster for engaging in protected activity.

### D.    Punitive Damages

Lastly, NSRC contests the award of $25,000 in punitive damages. An award of punitive damages is appropriate where the employer intentionally, recklessly, or callously disregards the employee's rights under the FRSA. *Youngerman v. United Parcel Serv., Inc.*, No. 11-056, 2013 WL 1182311, at *3 (Dep't of Lab. Admin. Rev. Bd. Feb. 27, 2013). NSRC argues that punitive

damages were not merited because "[p]unitive damages are only proper if [NSRC] intentionally, recklessly or callously disregarded Lancaster's rights *under the FRSA* – not his rights under the Hours of Service Act." As a result, NSRC challenges the right of the Board to consider NSRC's "repeated violations of the Hours of Service Act."

As the ALJ noted, FRSA-protected activity extends beyond the scope of conduct prohibited by its statutory framework; it explicitly protects refusals to violate "any Federal law, rule, or regulation relating to railroad safety or security," 49 U.S.C. § 20109(a)(2). The Hours of Service Act, as discussed earlier, seeks "to promote the safety of employees and travelers upon railroads by limiting the hours of service of employees," 49 C.F.R. § 228, App'x A. Given its purpose, the Hours of Service Act falls plainly within the scope of the FRSA's retaliation provision as a federal law relating to railroad safety, which also allows the FRSA to protect the rights of employees to refuse to violate the Hours of Service Act. It is expressly within the authority of the ALJ and the Board to consider the various Hours of Service Act violations—which underpinned the FRSA violation—when it determined whether punitive damages were appropriate.

The Board's decision in *Youngermann*—a case concerning the Surface Transportation Assistance Act (STAA)—is instructive. 2013 WL 1182311, at *4. There, a driver refused to violate a safety regulation, and was ultimately disciplined for refusing to do so. *Id.* In assessing punitive damages, the ALJ looked to the many failures to follow that Department of Transportation regulation, reasoning that the employer's "commitment to its company-wide safety policies [was insincere] given the evidence that several managers entrusted with their enforcement failed to follow them." *Id.* at *6. Likewise, here, the ALJ considered the testimony showing NSRC's lack of commitment to the Hours of Service Act, a federal safety concern reinforced under the FRSA. As the ALJ indicated, NSRC's "witnesses expressed no interest whatsoever in obeying or

enforcing the crew service limits which have been a prominent feature of federal railroad safety regulation for more than 110 years." On this record, we find that the Board did not err in affirming the ALJ's punitive damages award to redress NSRC's admittedly repeated disregard of a critical railway safety standard that has governed for more than a century.

## III. CONCLUSION

Having found no error in the Board's decision, we **DENY** the petition for review.

THAPAR, Circuit Judge, dissenting. To save the untimely claim of a single employee, the majority tramples on the Federal Railway Safety Act. In the process, it unintentionally hurts the very people the Act is meant to protect.

In the majority's view, railroad employees have no rights under the Act until their employer makes a final decision. And according to the majority, a final decision can't be made until any disciplinary processes in the employees' collective-bargaining agreements conclude. As a result, retaliated-against employees can be suspended without pay and without knowing when or whether they'll be allowed to return to work. That can't be right. The Act expands on any bargained-for rights; it isn't limited by them. *See* 49 U.S.C. § 20109(h). Yet the majority's erroneous reading artificially *restricts* railroad employees' rights under the Act.

On top of that, the majority's analysis of the Act's procedural requirements upends a long-standing presumption of attorney-client agency in the context of statutory notice requirements. I respectfully dissent.

I.

Scotty Lancaster believes his employer, Norfolk Southern Railway Company, illegally suspended him without pay for forty days when he exercised his rights under the Hours of Service Act. So he submitted a complaint to the Occupational Health and Safety Administration (OSHA) alleging unlawful retaliation under the Federal Railway Safety Act (Railway Safety Act). OSHA dismissed Lancaster's complaint. So Lancaster filed objections and requested a hearing before an Administrative Law Judge (ALJ). After the hearing, the ALJ found that Norfolk violated the Railway Safety Act by retaliating against Lancaster. The Administrative Review Board (Board) agreed.

II.

In its petition for review, Norfolk argues that Lancaster's complaint and his objections to OSHA's initial determination were untimely and that the Board's decision thus requires reversal. The majority disagrees, concluding that Lancaster was timely in both instances. I address Norfolk's arguments in turn.

A.

The Railway Safety Act grants railroad employees a cause of action to protect against unlawful retaliation. 49 U.S.C. § 20109(d)(1). But the plaintiff must bring the claim within 180 days of the alleged statutory violation. *Id.* § 20109(d)(2)(A)(ii). The key issue here is when that 180-day period began to run: when Norfolk suspended Lancaster without pay on November 27, 2015, or when Norfolk formalized that suspension in its final-decision letter on January 5, 2016.[1] If the former, Lancaster's complaint is time barred because he filed it on June 8, 2016—more than 180 days after the violation. But if the latter, the complaint is timely.

The plain language of the Act makes clear that Norfolk's November 27, 2015, decision to suspend Lancaster triggered the 180-day clock. The Railway Safety Act provides that a covered employer "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee" in retaliation for protected conduct. 49 U.S.C. § 20109(a). On November 27, 2015, Norfolk did exactly that. It suspended Lancaster that day for (allegedly) exercising his rights under the Hours of Service Act, which is indisputably protected conduct. So under the statute's plain language, that's when the 180-day statute of limitations began to run.

---

[1] I agree with the majority's conclusion that there's only one adverse employment action—Lancaster's suspension—and not multiple actions.

The majority disagrees. It claims that Lancaster couldn't file a complaint until Norfolk made a final disciplinary decision. In other words, Norfolk's decision had to be "specified and finalized" before Lancaster's cause of action accrued. Maj. Op. 7. To reach this conclusion, the majority relies on the collective-bargaining agreement (CBA) that Lancaster signed with Norfolk. But that doesn't justify imposing a final-decision rule not found in the Act.

1.

The majority claims its final-decision rule comes from the CBA. According to the majority, Norfolk's actions on November 27, 2015, merely "triggered the investigation process specified in this CBA—which the employer is required to undertake *before* issuing any discipline." Maj. Op. 7. So, the majority asserts, Norfolk *couldn't* have retaliated against Lancaster until it completed that process and sent him the letter with its final, post-investigation decision.

This approach ignores a key fact: Lancaster's rights here arise under the Railway Safety Act, not the CBA. In other words, the question isn't whether Norfolk's conduct on November 27, 2015, amounts to "discipline" under the CBA; the question is whether that conduct amounts to a "violation" of the Act. The majority conflates these two concepts. It looks to the CBA—not the statute—to define the conduct that triggers the *statute's* limitations period. This has it backwards; the Act—not the CBA—dictates what rights Lancaster has and when he can exercise them.

That's not to say that the CBA is irrelevant in the context of Railway Safety Act claims. As the majority notes, we shouldn't read the Railway Safety Act to "diminish" an employee's "rights, privileges, or remedies" under a collective-bargaining agreement. Maj. Op. 8 (quoting 49 U.S.C. § 20109(h)). But my reading of the Act does the exact opposite; it permits Lancaster to bring his claim *sooner* rather than wait for the CBA investigation to end. Of course, Lancaster could have still gone through the CBA's process. But the Act doesn't require him to do so.

Besides being legally dubious, the majority's reasoning could lead to extraordinarily harsh results. Take Lancaster as an example. In the majority's view, Lancaster has no rights under the Act until Norfolk's investigation ends and it formally imposes "discipline." In the meantime, he was sent home without pay and without knowing when or whether he could return to work—a challenge in even the best of circumstances. *Cf. Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 72–73 (2006). But what if a CBA-mandated investigation were allowed to drag on for six months without resolution? A year? The majority would conclude that the employee had no rights under the Railway Safety Act until the employer concluded its investigation. And what if Norfolk had ultimately reversed Lancaster's suspension? The majority's reasoning implies that Lancaster wouldn't have a claim under the Act—despite his suspension *without pay* for more than a month. The Railway Safety Act doesn't require these harsh results.

2.

The majority claims that its final-decision rule is consistent with "other labor contexts." Maj. Op. 9. But in the most analogous context, we don't apply a final-decision rule.

Like the Railway Safety Act, Title VII prohibits retaliation against employees for protected conduct, and employees need not wait to sue until a final decision has been rendered. 49 U.S.C. § 20109(a); 42 U.S.C. § 2000e-3(a); *see Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019) (citing *Burlington N.*, 548 U.S. at 59–69). Under Title VII, litigants claiming retaliation must show only "that a reasonable employee would have found the challenged action materially adverse." *Hubbell*, 933 F.3d at 569 (quoting *Burlington N.*, 548 U.S. at 68). That's a functional question, and thus a formal final decision isn't required. In fact, the Supreme Court has firmly

rejected a final-decision rule for Title VII retaliation claims. *See Burlington N.*, 548 U.S. at 67;[2] *see also Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 585 (6th Cir. 2017). What's more, the Supreme Court has held that the exact conduct complained of here—suspension without pay, even when the employee could later be reinstated with backpay—is a materially adverse employment action that triggers a Title VII retaliation claim. *See Burlington N.*, 548 U.S. at 70–73.

So the final-decision rule doesn't apply to retaliation claims brought under Title VII. Yet, the majority decides the final-decision rule should apply to retaliation claims brought under the Railway Safety Act. So much for the majority's claim that its rule is consistent with "other labor contexts."

\* \* \*

In short, Norfolk suspended Lancaster without pay on November 27, 2015, allegedly because of Lancaster's protected activity. That conduct violated the Act and triggered its 180-day statute of limitations. *See* 49 U.S.C. § 20109(a), (d); *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 292 (6th Cir. 2019) (A statute of limitations for a federal claim begins "when the plaintiff knows or has reason to know of the injury which is the basis for his action." (quoting *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984))). Yet Lancaster waited more than 180 days to file his complaint. So his complaint is untimely.

---

[2] In *Burlington Northern*, the Supreme Court phrased it as an "ultimate employment decision[]" rather than a "final decision." 548 U.S. at 67. But as we've explained, these two terms are coterminous. *See Benison v. Ross*, 765 F.3d 649, 659 (6th Cir. 2014) (equating the two terms in the First Amendment retaliation context); *Dobbs-Weinstein v. Vanderbilt Univ.*, 185 F.3d 542, 546 (6th Cir. 1999) (stating in the Title VII context that "[o]nly the final decision is the ultimate act" (citation omitted)), *overruled in part by White v. Burlington N. & Santa Fe Ry. Co.,* 364 F.3d 789 (6th Cir. 2004) (en banc); *accord Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 879 (8th Cir. 2005) (same).

B.

Even if Lancaster's complaint were timely, Norfolk argues that we should reverse for another reason: Lancaster failed to timely object to OSHA's findings dismissing his complaint.

Lancaster had thirty days "after the date of notification" to object to those findings. 49 U.S.C. § 42121(b)(2)(A).[3] His attorney received notice of the findings on November 13, 2017. But Lancaster didn't file his objections until February 6, 2018. By then, he was nearly two months too late.

The majority excuses Lancaster's tardiness by holding that the plain language of the Act requires the agency to give notice to *Lancaster*—not his attorney. And because the agency never sent Lancaster its findings, the majority concludes that the thirty-day statute of limitations was never triggered.

The majority is incorrect. Notice to Lancaster's attorney was enough to trigger the thirty-day clock. Indeed, well-established principles of agency law demand this result. "When a lawyer represents his client, his acts become the client's acts, his knowledge the client's knowledge." *Lampe v. Kash*, 735 F.3d 942, 944 (6th Cir. 2013). The same is true for notice. *See* 7A C.J.S. Attorney & Client § 264. At bottom, in "our system of representative litigation," each party is "considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash R.R. Co.*, 370 U.S. 626, 634 (1962) (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879)).

With this backdrop in mind, the Supreme Court has instructed lower courts to presume that notice to an attorney satisfies statutory notification requirements. *See Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 93 (1990). And until today, our circuit has done just that. *See, e.g.*, *Rembisz v.*

---

[3] As the majority notes, actions brought under the Railway Safety Act are "governed under the rules and procedures set forth in" 49 U.S.C. § 42121(b). 49 U.S.C. § 20109(d)(2)(A).

*Lew*, 830 F.3d 681, 682–83 (6th Cir. 2016) (holding that "receipt of notice" to an "employee" is "received when the agency delivers its notice to a claimant or the claimant's attorney, whichever comes first" (cleaned up)); *C.I.R. v. Stewart*, 186 F.2d 239, 240 (6th Cir. 1951) (holding that notice to the taxpayer's attorney satisfied statutory language requiring the agency to "send notice . . . to the taxpayer by registered mail").  Though none of these cases comes from this precise context, we must heed the Supreme Court's broad command:  "If Congress intends to depart from the common and established practice of providing notification through counsel, it must do so expressly."  *Irwin*, 498 U.S. at 93.  Congress didn't do so here.  So notice to Lancaster's counsel was enough to trigger the statute of limitations governing Lancaster's objections.[4]

Lancaster "voluntarily chose [an] attorney as his representative in the action."  *Link*, 370 U.S. at 633.  And "he cannot now avoid the consequences of the acts or omissions of this freely selected agent."  *Id.* at 633–34.  If the attorney erred, the proper route for recovery is a malpractice suit.  *See id.* at 634 n.10; *Mager v. Wis. Cent. Ltd.*, 924 F.3d 831, 840–42 (6th Cir. 2019) (Sutton, J., concurring).

\*        \*        \*

Time limits aren't mere technicalities.  They "have long been respected as fundamental to a well-ordered judicial system."  *Bd. of Regents v. Tomanio*, 446 U.S. 478, 488 (1980).  They reflect the will of Congress and, like any other procedural rules, help keep cases moving through the congested hub of agency and judicial review.

To reach a more palatable outcome for Lancaster, the majority ignores these principles and goes out of its way to save Lancaster twice over from his own untimeliness.  I respectfully dissent.

---

[4] Because the language of the statute is clear, I need not consider OSHA's regulations to confirm my reading as the majority does.  *See Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 986–87 (6th Cir. 2009).